Robert EHRENFELD and Elizabeth Ehrenfeld, Plaintiffs,

v.

Nelson WEBBER and Helen Webber, Defendants.

Civ. No. 76–122 P.

United States District Court, D. of Maine.

Aug. 4, 1980.

Ralph I. Lancaster, Jr., Portland, Me. (Charles S. Einsiedler and Donald A. Fowler, Jr., Portland, Me., of counsel), for plaintiffs.

John A. Graustein, Portland, Me. (John A. Anderson, III and Robert E. Hirshon, Portland, Me., of counsel), for defendants.

## OPINION AND ORDER OF THE COURT

TIMBERS, Circuit Judge: *

This case is about the Ehrenfelds and the Webbers. They do not get along and probably never will. At issue is whether these Maine counterparts to the Hatfields and the McCoys belong in the federal court.

■ The question presented is whether plaintiffs, the Ehrenfelds, have properly invoked the jurisdiction of this Court in the instant action against defendants, the Webbers, the action being essentially one to quiet title to two unimproved parcels of land located in Bristol and Bremen, Maine. More specifically, the question is whether, in this diversity action, the matter in controversy exceeds $10,000, exclusive of interest and costs, as required by 28 U.S.C. § 1332(a) (1976). For the reasons below, the Court holds that it does not. Accordingly, the action is dismissed for lack of subject matter jurisdiction.

The Court makes the following findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a), after a hearing held on July 7, 8, and 9, 1980, without a jury, and after receiving helpful briefs and listening to oral argument by able counsel on both sides.

### I

### PRIOR PROCEEDINGS

(A) *Complaint*

The action was commenced by the filing of a four count complaint on September 2, 1976.

Count I (the quiet title count) seeks a declaratory judgment to quiet title with respect to the two parcels of land referred to above. For convenience, the Court will refer throughout this opinion, as counsel for both sides did at the hearing, to the two parcels of land as parcel A (consisting of approximately 2 acres) and parcel B (consisting of $^{15}/_{100}$ths of an acre).[1] No money damage is claimed under Count I.[2]

---

* Of the United States Court of Appeals for the Second Circuit, sitting by designation.

1. Attached is Plaintiffs' Ex. 1, labeled "Town of Bremen Tax Assessors Map # 12–Lot 23". The Court has placed on the exhibit the legends "PARCEL A" and "PARCEL B" to indicate the approximate locations of the two parcels in dispute. Throughout the hearing, counsel and the witnesses referred to this map, and to a blackboard diagram based on the map, in identifying the two parcels.

■

PLAINTIFF'S EXHIBIT

2. The gravamen of this action is the quiet title count which reads as follows:

"1. Plaintiffs are residents of the State of New York.

2. Defendants are residents of the State of Maine.

3. The amount in controversy, exclusive of interest and costs, exceeds the sum of Ten Thousand Dollars ($10,000.00).

4. This Court has jurisdiction of this action under the provisions of 28 U.S.C. § 1332.

5. For more than one hundred years the Plaintiffs and those under whom they claim have been in uninterrupted possession of certain land and real estate in Bristol and Bremen, Maine, more particularly described in deed from Gerald R. MacCarthy and Elizabeth E. MacCarthy to Robert L. Ehrenfeld and Elizabeth MacCarthy Ehrenfeld dated September 23, 1974, recorded in Lincoln County Registry of Deeds in Book 824, Page 101, a copy of which is attached hereto as Exhibit A.

6. Part of said land is shown as Lot # 23 on a tax map of the Town of Bremen attached hereto as Exhibit B.

7. In August of 1931 Lois W. Ramstrom became the owner of a certain lot or parcel of land shown as Lot # 24 on the Bremen tax map in Bremen, Maine. At that time the contiguous property southerly of the Ramstrom property, being said Lot # 23, was owned by Lena Mae Vannah, one of Plaintiffs' predecessors in title.

Count II (the trespass count) seeks injunctive relief and damages with respect to alleged trespasses on parcel B. Double damages in amount of $4,000 are claimed under Count II.

Count III (the assault count) seeks damages for an alleged assault said to have been committed by defendant Nelson Webber upon plaintiff Robert Ehrenfeld on parcel B on July 15, 1976. Actual and punitive damages in amount of $35,000 are claimed under Count III.

8. Mrs. Ramstrom obtained permission from Chester Vannah, husband of Lena Mae Vannah and acting on her behalf, to mow the lawn and care for the premises known as Lot # 23 and did so with Chester Vannah's permission, acting on behalf of Lena Mae Vannah, and on his own behalf upon inheriting the property from Lena Mae Vannah upon her death in 1937, to and including March 30, 1950 when Chester Vannah sold the Bristol premises to Richards Thorne Miller and Helen Thorne Miller.

9. From March 30, 1950 to September 25, 1951 Mrs. Ramstrom continued to mow the lawn and care for Lot # 23 with the permission of the Millers.

10. On September 25, 1951, the Millers sold the Bristol premises and Lot # 23 to Gerald R. MacCarthy and Elizabeth E. MacCarthy. From that date to September 23, 1974 Lois Ramstrom continued to mow the lawn on Lot # 23, store her raft on Lot # 23, plant flowers and vegetables and store her dinghy on Lot # 23 all by permission of Gerald R. and Elizabeth MacCarthy.

11. On September 23, 1974 Gerald and Elizabeth MacCarthy sold the Bristol premises and said Lot # 23 in Bremen to Plaintiffs Robert and Elizabeth Ehrenfeld and thereafter the Ehrenfelds maintained said Lot # 23 and Lois Ramstrom continued to make use of said Lot # 23 with the same permission from the Ehrenfelds.

12. In 1951 Ernest T. and Florence M. Thompson purchased a piece of land in the Town of Bristol from LaForest Ethridge by warranty deed. At that time LaForest Ethridge conveyed to the Thompsons by release deed any rights he might have regarding another piece of property, partly in Bristol and partly in Bremen, which he described to the Thompsons as a claim to water rights of questionable validity regarding Lot # 23 on the Bremen tax map.

13. From August of 1951 until November 3, 1975 Ernest T. and Florence M. Thompson never asserted any claim to any rights to the property purported to be conveyed by said release deed. Ernest T. and Florence M. Thompson in fact stated that they understood the land in question belonged to the McCar-

Count IV (the conversion count) seeks recovery of the fair value of certain fence sections and posts claimed to have been removed by defendants from parcel B on July 15, 1976. No specific amount of damage is claimed under Count IV.

(B) *Answer, Counterclaim and Motion To Dismiss*

Defendants filed an answer, counterclaim and motion to dismiss on October 8, 1976.

thys and that any water rights had been lost by nonuse.

14. In November of 1975 Ernest and Florence M. Thompson were engaged in right-of-way litigation with Nelson and Helen Webber, the Defendants in this case. Upon information and belief, the Webbers told the Thompsons that they were willing to settle that claim provided that the Thompsons transferred to them their interest along the Muscongus mill creek. The Thompsons informed the Webbers that they had no such interest but agreed to give the Webbers a quit claim deed to any rights in order to settle their own dispute with the Webbers. The Webbers thereby now claim some right or interest in said property owned by the Ehrenfelds.

15. On and prior to July 15, 1976 Defendants willfully or knowingly trespassed and caused others to trespass upon Plaintiffs' said land, including Lot # 23, and have claimed and are claiming an undefined interest in Plaintiffs' said real estate either in Bristol or Bremen, Maine or both.

16. Defendants' said claims of interest in Plaintiffs' said real estate create a cloud upon Plaintiffs' title and depreciate the market value of said property.

WHEREFORE, Plaintiffs pray that the Court declare that:

A. Defendants, and any and every person claiming through or under them, are barred from all claims to any right, title, interest or estate in the above described real property of the Plaintiffs;

B. Plaintiffs are vested with title to the above described real property in fee simple, free and clear of all claims by Defendants or any person claiming by, through or under them; which judgment shall operate directly on the land and shall have the force of a release made by or on behalf of Defendants of all claims inconsistent with the title established or declared hereby;

C. Plaintiffs are entitled to costs against any Defendant or Defendants who shall assert in this action a claim or claims adverse to Plaintiffs;

D. Plaintiffs have such other and further relief as the Court may deem just and proper."

The answer denies the material allegations of the complaint.

The original counterclaim seeks a judgment that title to parcels A and B is in defendants, not in plaintiffs. While the original counterclaim alleges that "[d]efendants are entitled to damages for rents and profits of the premises and for destruction of said premises", no specific amount of damage is claimed under the original counterclaim. Defendants filed an amendment to their counterclaim on January 5, 1977 which alleges, inter alia, that plaintiff Robert Ehrenfeld committed an assault on defendant Nelson Webber on parcel B on July 15, 1976, for which $35,000 actual and punitive damages is claimed.

Defendants' motion to dismiss reads as follows:

### "MOTION TO DISMISS

Defendants move that Plaintiffs' Complaint be dismissed due to lack of jurisdiction of this Honorable Court for the following reasons:

1. The subject matter of this controversy mainly concerns a parcel of land less than $1000.00 in value.

2. Any damages resulting to the land are minimal, not to exceed $200.00.

3. The allegation of personal injury by Plaintiff Robert Ehrenfeld under Count III was solely for the purpose of bringing this matter before this Honorable Court rather than the State Court where this matter should be adjudicated, said Plaintiff in fact sustaining no personal injury.

4. No allegation as to value of fence sections and posts has been made, and, if such were the case, all damages and injuries in four Counts, even if proved, would not equal or exceed $10,000.00.

5. Defendants are in fact aggrieved by Plaintiffs' conduct towards your Defendants in that lawful claim has been made against land of Defendants in Lincoln County, Maine, where such matter should be litigated."

(C)  *Pretrial Conferences*

Five pretrial conferences were held in this action as follows:

| Date | Before |
|------|--------|
| (1) December 10, 1976 | Magistrate Nathanson |
| (2) July 18, 1978 | Magistrate Zarr |
| (3) May 25, 1979 | Magistrate Zarr |
| (4) April 2, 1980 | Judge Gignoux |
| (5) June 19, 1980 | Judge Timbers |

After the first pretrial conference, Magistrate Nathanson stated in his report filed December 16, 1976, with respect to the jurisdictional amount issue, as follows:

"The defendants have brought a Motion To Dismiss, for want of jurisdiction of this Court to entertain this case. The defendants allege that there is legal claim to certain land that is less than the jurisdictional amount, and that there was bad faith in the representation, that this claim is for an amount in excess of $10,-000., exclusive of interest and costs. There is currently insufficient evidence before the Court, at this time, to make a determination thereon. *At the Final Pretrial Conference of this case, when discovery has been completed, there should be either sufficient evidence before the Court, upon which to entertain said motion, or an evidentiary hearing may be required.*" (emphasis added).

After the second pretrial conference, Magistrate Zarr stated in his report filed July 20, 1978, with respect to the jurisdictional amount issue, as follows:

"Defendants maintain that the amount in controversy is less than $10,000. Defendants submitted a memorandum in support of their motion.

After hearing argument, the Court denied defendants' motion to dismiss and endorsed the motion accordingly."

No further reference was made to the jurisdictional amount issue at the third and fourth pretrial conferences, so far as the reports of those conferences disclose.

At the fifth and final pretrial conference held June 19, 1980 before the undersigned, however, the Court, pursuant to its duty to examine the jurisdictional underpinning of

a case at any stage of the proceeding, squarely raised the question whether the amount in controversy exceeded $10,000 exclusive of interest and costs.[3] Counsel for both sides stated their respective positions. The Court was left with the distinct understanding that the action was essentially a quiet title action; that the value of the land involved ranged somewhere between $1,000 and $3,000; that the claims of damage, exclusive of the assault count, could not conceivably exceed $10,000; and that the sole basis for invoking federal jurisdiction in this diversity action was the $35,000 damages claimed under the assault count. The upshot was that the Court ordered, pursuant to Fed.R.Civ.P. 42(b), a prior and separate trial of the issue of damages before undertaking a trial on the merits of this quiet title action. The reasons for ordering a prior and separate trial, as the Court informed counsel, were (1) to enable the Court to determine whether the amount in controversy exceeded the jurisdictional amount required for diversity jurisdiction, and (2) to facilitate a settlement, depending on the outcome of the prior and separate trial, before embarking on a long and costly trial of the quiet title action. "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939).

**(D) *Evidentiary Hearing***

The Court then conducted a three day hearing on damages. In order to determine the maximum amount of plaintiffs' claim, it was assumed that all issues on liability had been resolved in plaintiffs' favor. Thus, it was assumed that plaintiffs properly held title to parcels A and B; that defendants

had trespassed on parcel B; that defendant Nelson Webber assaulted plaintiff Robert Ehrenfeld on parcel B on July 15, 1976; and that defendants had converted plaintiffs' fence. The evidence adduced at this hearing on damages is summarized in detail in the following section.

## II

### EVIDENCE OF DAMAGES

In light of the foregoing prior proceedings, the Court turns next to the facts, as adduced at the three day trial on damages, and the relevant law.

Our starting point for determining whether an action satisfies the $10,000 amount in controversy requirement is the familiar "legal certainty" test of *Saint Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938):

"The intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts. The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the

---

**3.** The Court is mindful of the earlier conflicting positions of the magistrates on the jurisdictional issue, referred to above. Although Magistrate Zarr on July 20, 1978 denied defendants' motion to dismiss on the ground the amount in controversy was less than $10,000, Magistrate Nathanson on December 16, 1976 had ordered resolution of the issue deferred until the final pretrial conference when "there should be either sufficient evidence before the Court, upon which to entertain said motion, or an evidentiary hearing may be required."

In ordering the evidentiary hearing, as the Court did at the final pretrial conference on June 19, 1980, the Court simply provided for what it believed to be an orderly, swift and inexpensive method of determining its own jurisdiction as an incident of the prior and separate trial of the issue of damages.

face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or *if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed."* (footnotes omitted) (emphasis added)

The Court here need not resolve whether the pleadings support a finding of $10,000 or more since "the 'proofs' adduced at [the damage phase of the] trial conclusively shows that [plaintiffs] never had a claim even arguably within the $10,000 range." *Jimenez Puig v. Avis Rent–A–Car System,* 574 F.2d 37, 39 (1 Cir. 1978). Plaintiffs have failed to meet their burden of proving "that the jurisdictional amount is really and substantially involved." *Fritz v. Warner–Lambert Pharmaceutical Co.,* 349 F.Supp. 1250, 1252 (E.D.N.Y.1972).

Each count of plaintiffs' complaint will be reviewed separately—in the order of the simplicity of the jurisdictional amount issue under each count.

### COUNT IV (Conversion Count)

Plaintiffs introduced a bill (Plaintiffs' Ex. 14) in amount of $703.31 representing the cost of certain fence sections and posts which they claim defendants removed from parcel B on July 15, 1976. It is undisputed that this is the full amount claimed and proven under Count IV.

### COUNT II (Trespass Count)

Plaintiffs introduced a bill (Plaintiffs' Ex. 15) in amount of $98.00 representing the cost of loam which they claim was necessary to replace topsoil they say was removed from parcel B by defendants. This was the only amount of alleged damage proven under Count II, although plaintiffs claim under this count unspecified and unproven damages resulting from such actions by defendants on parcel B as "lopping off limbs", "dumping a boat cradle", "placing laths" and "digging holes". Although both plaintiffs testified at the hearing, neither made any attempt even to estimate, let alone prove, the amount in controversy un-

der Count II, other than the $98.00 referred to above. Although plaintiffs' claim for double damages under 14 Me.Rev.Stat.Ann. § 7522 is tenuous, *Nyzio v. Vaillancourt,* 382 A.2d 856, 863–64 (Me.1978), the Court will accept it for present purposes and double the amount of actual damages to $196.00.

### COUNT III (Assault Count)

As stated above, the Court was led to believe at the final pretrial conference on June 19, 1980 that the sole basis for invoking federal jurisdiction in this quiet title action was the $35,000 damages claimed under this assault count. Accordingly, the Court listened with particular interest during the three day hearing to ascertain what damage plaintiff Robert Ehrenfeld (hereinafter Ehrenfeld) sustained as a result of the alleged assault said to have been committed upon him by defendant Nelson Webber (hereinafter Webber) on July 15, 1976.

While there were different versions, referred to below, of the so–called assault, it is undisputed that as a result thereof Ehrenfeld sustained no physical injury whatsoever—not even a scratch or a bruise. He received no medical treatment by any doctor, nurse or anyone else. He was not hospitalized. He lost no time from his employment as a chemist with a company in the New York City area. Viewed in the light most favorable to Ehrenfeld—and in his own words—he was "scared", "frightened", "humiliated", "shaken" and "sort of shivering".

Turning to the episode involving the alleged assault, it occurred shortly after 7 A.M. on the morning of July 15, 1976 on parcel B—in the general area of Bristol and Bremen. Webber, a lobster fisherman who had been out fishing with one of his daughters since 4:30 A.M., came into his marina known as Webber's Landing and tied up about 7 A.M. From there he could see five men and a truck on parcel B up the hill a bit. Webber went directly to parcel B.

There he saw Ehrenfeld and four workmen who were about to unload from their truck the fence sections and posts which Ehrenfeld had ordered them to install along the south and east boundaries of parcel B.

Depending on the point of view, the purpose of the fence was, according to Ehrenfeld, to assert his claim of ownership; or, according to Webber, to erect the traditional spite fence, but on land owned by Webber. When Webber arrived on the scene, Ehrenfeld had driven in a wooden stake from which he was unwinding a ball of twine to indicate the boundaries of parcel B where the fence was to be installed. The alleged assault was precipitated by the tugging on the twine by Ehrenfeld and Webber, respectively, after Webber had pulled up the stake.

Of the several versions of what happened thereafter, the Court accepts Ehrenfeld's version which is set forth verbatim in the margin.[4] The Court does so, not because his was the most plausible or credible testimony as to how the alleged assault occurred, but because the Court believes that in fairness to plaintiffs, solely for the purpose of determining the issue of jurisdictional amount, this evidence as to the occurrence of the assault should be viewed in the light most favorable to plaintiffs.

Ehrenfeld testified in substance that Webber pulled in the twine while Ehrenfeld held the ball of twine tightly in his hand; that Webber repeatedly asserted his right to the property; that when the two came together Webber grabbed Ehrenfeld "in kind of a bear hug" and "started wrestling" with him, after which Ehrenfeld "was on the ground". He testified to the resulting "injuries" summarized above.

Ehrenfeld's New York lawyer, who arrived at the scene sometime after Ehrenfeld

---

4. TESTIMONY OF ROBERT L. EHRENFELD: DIRECT EXAMINATION BY MR. LANCASTER:

\* \* \*

Q Now, as you were engaged in doing the activities that you've just described, did Mr. Nelson Webber come to the scene?

A Yes.

Q Had you ever met or seen Nelson Webber before?

A Yes.

Q And would you tell the Court, please, what happened when Mr. Webber came to the scene?

A Well, he was obviously very agitated, and the first thing he did was to pull up the stake that I had put in the ground, and then he pulled in pulling the string in, he approached me. That is, he was pulling on the string which I was holding, and approaching me as he pulled in the string, and all the time saying words to the effect that this is my property; get off; this is my property.

Q All right. And what physically happened then?

A He continued that until he came right against me, and trying to pull the string, the ball of string out of my hand; and I was holding it tightly. And then, the next thing I knew, he grabbed me around in kind of a bear hug and started wrestling with me. And then, the next thing I knew, I was on the ground.

Q Now, Mr. Ehrenfeld, do you have a physical condition? Do you have some part of your anatomy that's missing?

A Yes. I just have one kidney.

Q And as a result of having only one kidney are your physical activities limited by doctors' orders?

A Yes. I've been advised not to do skiing and horseback riding.

Q And why is that?

A Well, you don't want to injure your last kidney.

Q After you landed on the ground, would you tell the Court, please, how you felt?

A Well, I was—first of all, scared, frightened that—it was a very tense business, and I was humiliated because this was being dumped on your own ground in front of everybody else. And I was very shaky.

Q And, physically, did you have–did your body have any reaction to this episode?

A Well, I was shaken. That is, I was sort of shivering, you might say.

Q Did you then shortly thereafter leave the scene to make a telephone call?

A Yes. I went back to the MacCarthy house to call the sheriff.

Q And in the process of making that telephone call, what was your condition?

A Well, I realized that I had to first get the telephone book and look under whatever it was, where the sheriff's number was. And then I then, with kind of a nervous, shaking hand, dialed the number; which I did.

Q Did you have any trouble finding the number in the phone book?

A I guess I had to look under county–Lincoln County, rather than Wiscasset.

Q And, physically, did your condition manifest itself in any way while you were looking at the phone book?

A Well, as I said, I was–this shivering thing that I get when I'm very scared, yes.

Q Subsequently, did you come back to the scene; back to Parcel B?

A Yes, I did.

did, testified substantially the same as Ehrenfeld regarding the alleged assault—even to the point of characterizing Webber's grabbing Ehrenfeld with a "bear hug". The lawyer testified on cross–examination that there were no hand blows and no kicking.

Dwayne Seiders, one of the four workmen whom Ehrenfeld had employed to erect the fence, testified substantially in accordance with the Ehrenfeld version of the alleged assault.

If the Court were called upon to decide how the alleged assault occurred in accordance with the accepted criteria for determining and evaluating credibility of witnesses, the Court surely would accept as most plausible and credible the version testified to by Nancy Webber, the 16 year old daughter of Webber.[5] She was 12 years old on July 15, 1976, the day before her thirteenth birthday. She testified in substance that Webber pulled up the wooden stake and threw it aside; that Webber then picked up the ball of twine and, stepping to one side, proceeded to roll up the twine; that Ehrenfeld stepped in front of Webber and walked backwards downhill, attempting to block Webber's path; that when Ehrenfeld lunged for the twine, Webber pulled the twine away from Ehrenfeld who thereupon lost his balance, slipped on the moist grass and stumbled backwards down hill, missing his footing.

Webber's own version of the alleged assault was consistent with Nancy's. He testified that Ehrenfeld was 10 feet away from Webber when Ehrenfeld grabbed for the twine, slipped and fell down. It should be noted, in view of the amendment to the counterclaim filed January 5, 1977, that Webber's testimony does not support the allegation that Ehrenfeld committed an assault upon Webber on July 15, 1976.

■ Turning to the $35,000 valuation of Ehrenfeld's "fright" and "humiliation", it is well settled that "an exaggerated or frivolous allegation of amount which is

without foundation will not serve to provide jurisdiction." *Holzsager v. Warburton*, 452 F.Supp. 1267, 1274 (D.N.J.1978). As their backlog continues to climb, federal courts have grown increasingly skeptical of tort cases where only minor physical injuries are involved and have not hesitated to dismiss these actions for failure to satisfy the amount in controversy requirement. *E. g., Burns v. Anderson*, 502 F.2d 970 (5 Cir. 1974); *Nelson v. Keefer*, 451 F.2d 289 (3 Cir. 1971); *Turner v. Wilson Line*, 242 F.2d 414 (1 Cir. 1957); *Bewley v. Sims*, 438 F.Supp. 708 (D.Md.1977). Where there is no evidence of physical injuries and the claim seeks compensation only for emotional injuries, as is the case here, that skepticism is more accurately described as outright hostility. *Jimenez Puig v. Avis Rent–A–Car System, supra; Davis v. Licari*, 434 F.Supp. 23, 26 (D.D.C.1977). With this background in mind, it seems clear that Ehrenfeld is entitled to only a nominal compensatory award for his fright and humiliation.

■ Plaintiffs, however, contend that the nature of Webber's assault calls for an award of punitive damages. Under Maine law, "smart" money or punitive damages are recoverable in a tort action where there is evidence of malice or willfulness. *Pettengill v. Turo*, 159 Me. 350, 362–63, 193 A.2d 367, 374–75 (1959). An award here of punitive damages, however, is somewhat questionable. Even assuming that plaintiffs properly held title to parcel B, it cannot be denied that Webber *thought* he and his wife owned the property. They had received a deed to the property in February 1976. Therefore in Webber's own mind he was acting in defense of his property. There are no Maine cases on whether a willful act done in good faith is a proper basis for punitive damages. Nevertheless, for the purpose of determining the amount in controversy, the Court will accept plaintiffs' argument that punitive damages are recoverable.

---

5. The Court, immediately upon the conclusion of Nancy Webber's testimony, informed counsel in open court, on the record, that, regard-

less of the merits of the case, the Court regarded her testimony as that of a thoroughly candid, credible witness.

■ The trial court, however, has wide discretion in evaluating punitive damages when such damages are claimed to confer federal jurisdiction. *Zahn v. International Paper Co.,* 469 F.2d 1033, 1033–34 n. 1 (2 Cir. 1972), *aff'd,* 414 U.S. 291 (1973); *Bewley v. Sims, supra,* 438 F.Supp. at 711–12. Under Maine law, an award of punitive damages must bear a relationship to the nature and extent of the wrong. *Farrell v. Kramer,* 159 Me. 387, 391, 193 A.2d 560, 562 (1963). Considering the minor nature of Webber's offense, only a minimal award of punitive damages, if any, would be justified. Moreover, evidence of provocation on the part of a plaintiff in a long–running feud between the parties is a mitigating factor in awarding punitive damages. *Id.* Even accepting plaintiffs' version of the assault, the Court finds clear evidence of provocation. Surely Ehrenfeld knew that his erection of a fence on a hotly disputed boundary line would provoke a reaction from Webber.

The Court finds to a legal certainty, therefore, that plaintiffs are entitled at most to a total award of $500 under their assault count. Any higher amount would be manifest error and a disservice to justice.[6]

*COUNT I* (Quiet Title Count)

■■ This brings us to the gravamen of the complaint–Count I–under which plaintiffs seek a declaratory judgment to quiet title to parcels A and B. At the outset the Court notes that no claim for money damages is made under this count of the complaint. As late as the final pretrial conference on June 19, 1980, there was no representation that the amount in controversy under this count was anything more than $1,000 to $3,000, the value of parcels A and

B. On the eve of the damage trial, however, and after the Court had expressed its doubts on the amount in controversy requirement, plaintiffs suddenly claimed that damages under this count would satisfy the $10,000 threshold. In their trial memorandum of July 3, 1980, plaintiffs for the first time submitted that the value of their property on the westerly border of parcel A—approximately 34 acres—would decline in excess of $10,000 if the Court were to hold that they did not have title to parcels A and B. The Court holds that plaintiffs' method of determining the amount in controversy under this count is improper and that the proper valuation of the amount in controversy is at most $3,500. Even if plaintiffs' method of evaluating the amount in controversy is proper, the Court holds that there is no credible evidence supporting it and that it is colorable and made solely for the purpose of conferring federal jurisdiction.

"In actions seeking declaratory . . . relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. *E. g., McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 181 (1936); *Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.,* 239 U.S. 121, 126 (1915); *Hunt v. New York Cotton Exchange,* 205 U.S. 322, 336 (1907); 1 J. Moore, Federal Practice ¶¶ 0.95, 0.96 (2d ed. 1975); C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3708 (1976)." *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 347 (1977). Thus, "[i]f suit is brought to quiet title to land . . . and the cloud affects the entire title, then the value of the property . . . plaintiff seeks to protect is the measure of the amount in controversy." 14 C. Wright, A. Miller, & E.

---

6. It should be noted that during closing arguments on July 9, 1980, the last day of the evidentiary hearing, whereas defendants' counsel summarized the evidence of the amounts in controversy under *each* of the four counts, plaintiffs' counsel did not refer in any way to the asserted amounts in controversy under the assault, trespass or conversion counts, confining himself *exclusively to Count I, the quiet title count.* The Court does not suggest that this represents a waiver or abandonment of plaintiffs' jurisdictional amount claims under Counts II, III and IV. But in view of the emphasis placed at the final pretrial conference on June 19, 1980 upon the $35,000 claim under the assault count as providing the jurisdictional underpinning for the entire action (see pages 1287 1288, *supra*), the total absence of any reference whatsoever to this count during the closing argument by plaintiffs' counsel is surely noteworthy.

Cooper, Federal Practice and Procedure § 3702 at 386 & n. 46 (1976) (collecting cases). In the instant declaratory judgment action to quiet title to parcels A and B, the amount in controversy is the value of parcels A and B, "the object of the litigation." The evidence on this value is clear and uncontroverted.

As an expert witness, defendants presented Albert J. Childs of Freeport. He is president of Eastern Appraisal, Inc., with an office in Portland. He struck the Court as being eminently well qualified, having testified frequently in the Maine state courts, in various federal courts and in the Maine bankruptcy court. He testified that neither parcel A nor parcel B was "buildable" under local zoning ordinances; that the highest and best use of parcel A was a very limited one, viz. sale to abutting owners; and that the highest and best use of parcel B would be as an adjunct to the Ranstrom property immediately to the north of parcel B. *See* map included in footnote 1, *supra.* Childs emphasized that the plane of view— referred to as the "primary view"—from the Ehrenfeld house (which is located west of parcels A and B) is to the *south* and *west* of both parcels; in short, neither parcel A nor parcel B interferes with the view of the harbor from the Ehrenfeld house. Having been engaged to value parcels A and B, Childs expressed the opinion that as of July 1980 the probable market value of parcel A was between $1,500 and $2,000 and that of parcel B was between $1,000 and $1,500.

Plaintiffs presented as their expert witness John Hilton of Newcastle. He does not purport to be a real estate appraiser, but is a real estate broker in Medomak. He was first engaged on July 1, 1980 to make an "inspection" of the Ehrenfeld property which he did on July 3, 1980.[7] He did not prepare any appraisal report. *He was not called upon to value the land in dispute—*

*parcels A and B—and expressed no opinion regarding their value.* Having "inspected" the property, which apparently means having walked over the property, five days before he testified, it is difficult to understand why he was not asked to express his opinion as to the value of the land in dispute. Drawing the usual inference when a party has evidence in his possession, or under his control, but fails to disclose it, the Court is constrained to conclude that, if Hilton had been asked to express his opinion as to the value of parcels A and B, that opinion would have been unfavorable to plaintiffs' position.

The Court concludes therefore that the value of parcels A and B is at most $3,500 ($2,000 for parcel A plus $1,500 for parcel B).

Plaintiffs, however, contend that the amount in controversy is not the value of parcels A and B but the decline in value of their adjoining property should they lose this quiet title action. Insofar as plaintiffs suggest that the amount in controversy can be measured in terms of the injury being averted, the Court agrees. *Kheel v. Port of New York Authority*, 457 F.2d 46, 49 (2 Cir.), *cert. denied*, 409 U.S. 983 (1972). But here the injury being averted is the loss of parcels A and B. The decline in the value of the Ehrenfelds' other property is an indirect injury that plaintiffs seek to prevent. As stated below, their evidence in support of this claim is speculative. In the words of the *Kheel* court, the relevant damages are those that flow "directly and with a fair degree of probability from the litigation, not from collateral or speculative sources." *Id.; accord, Carman v. Richardson*, 357 F.Supp. 1148, 1157 (D.Vt.1973).

Plaintiffs' reliance on *A. C. McKoy, Inc. v. Schonwald*, 341 F.2d 737 (10 Cir. 1965), is

---

7. July 3, 1980 also is the date upon which plaintiffs filed a brief with the Court asserting *for the first time* their theory that "the Ehrenfelds could be damaged by at least $10,000 should this Court find that they did not have title to the disputed parcels." Plaintiffs' Trial Brief On Damages, filed July 3, 1980, at 5. July 3 was the Thursday before a three day holiday weekend. The trial had been scheduled to begin, and did begin, Monday, July 7, as confirmed at the final pretrial conference held on June 19.

\* \* \*

The conclusion is inescapable that this belated assertion of a claim of damages under Count I was solely for the purpose of creating a "jurisdictional amount" to avoid dismissal for lack of subject matter jurisdiction.

misplaced. Plaintiff in *McKoy* had given defendant a lease in his mineral interests. When defendant attempted to extend the lease, plaintiff brought suit to quiet title to the mineral interests. The court held that the amount in controversy was the diminished value of the property in question, *i. e.*, the mineral interests, if defendant were permitted to extend the lease. *Id.* at 739. Here too the amount in controversy is the diminished value of the property in question. But the property in question is parcels A and B, *not* plaintiffs' other property.[8] Defendants make no claim to title in plaintiffs' other property.

Moreover, even if the decline in value of plaintiffs' other property were the proper measure of damages, there is no credible evidence as to the amount of the decline. Plaintiffs' sole proof on this point consisted of the testimony of Hilton, their alleged expert. The Court finds his testimony to be utterly worthless. It reflects the witness' woeful lack of qualifications as an appraiser. He offered no explanation for his asserted "$15,000 to $20,000" diminution in the value of the "other Ehrenfeld property". An expert opinion without any supporting analysis of course is worthless. For aught that appears in the record before the Court in the instant case, the witness did no more than pluck the "$15,000 to $20,000" figure out of thin air. The Court finds the testimony of this alleged expert witness to be wholly incredible. *See A. C. McKoy, Inc. v. Schonwald, supra*, 341 F.2d at 739 (proper for trial court to discredit testimony on diminished value of property in question).

Finally, all signs indicate that plaintiffs' belated claim of damages under the quiet title count in terms of the decline in value of their other property was made solely for the purpose of creating a jurisdictional amount to avoid dismissal of the action. In a case that had been pending for nearly four years, in which five pretrial conferences had been held, plaintiffs waited literally until the eve of trial, July 3, 1980—14 days after the fifth and final pretrial conference—to assert for the first time their current theory of damages. July 3, 1980 also was the date on which plaintiffs' alleged expert witness, Hilton, was dispatched to inspect plaintiffs' property. Sudden changes in a plaintiff's complaint occurring late in the day and after a challenge to the amount in controversy valuation strongly suggest that the claim has been inflated solely to satisfy the $10,000 requirement. *Deutsch v. Hewes Street Realty Corp.*, 359 F.2d 96, 100 (2 Cir. 1966); *Fritz v. Warner–Lambert Pharmaceutical Co., supra*, 349 F.Supp. at 1253; *Brown v. Bodak*, 188 F.Supp. 532, 534 (S.D.N.Y.1960). In the words of Judge Kaufman in *Brown*, the purpose of the $10,000 threshold—the elimination of insubstantial claims—"is not to be thwarted by the plaintiff merely playing a numbers game and adjusting these numbers to suit his convenience." *Id.*

In summary, based upon the proof adduced at trial, the Court finds to a legal certainty that the maximum amount in controversy under each count of the complaint is as follows:

| COUNT I | (Quiet Title Count) | $3,500.00 |
|---|---|---|
| COUNT II | (Trespass Count) | 196.00 |
| COUNT III | (Assault Count) | 500.00 |
| COUNT IV | (Conversion Count) | 703.31 |
| | TOTAL | $4,899.31 |

Plaintiffs' complaint fails to satisfy the $10,000 amount in controversy requirement of 28 U.S.C. § 1332(a) and must be dis-

---

8. Plaintiffs' Trial Brief on Damages, at 5, leaves no doubt that the property in question is parcels A and B and not the Ehrenfelds' other property:

"The Complaint seeks the following relief:
1. A declaration that Plaintiffs are vested with title in fee simple absolute to an approximately triangular piece of land in Bremen which provides access to the town road and has frontage on Muscongus Harbor and the so-called Muscongus Brook. [Parcel A] Plaintiffs also seek a declaration that they are vested in title in fee simple absolute to a 66 foot strip of land located in Bristol, southwesterly of the so-called Muscongus Brook. [Parcel B]"

missed for lack of subject matter jurisdiction. In short, this case is nothing more than a petty local land dispute involving matters uniquely within the expertise of state courts. Although they make for good theatre, actions of this type pose a serious threat to the Court's struggle to keep its caseload current.[9] This Court has far more important business than to fritter away its time attempting to determine the proper location of a spite fence.

Accordingly, the Clerk of the Court is directed to enter a judgment dismissing this action for lack of subject matter jurisdiction. Costs are to be taxed against plaintiffs in favor of defendants.

IT IS SO ORDERED.

---

**9.** See, for example, the increasing workload of the United States District Court for the District of Maine during the past five years as reflected in the following portion of the statistics prepared by the Administrative Office of the United States Courts for the Subcommittee On Judicial Statistics of the Court Administration Committee of the Judicial Conference of the United States in connection with the Subcommittee's 1980 Biennial Judgeship Survey:

