*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NORTHUP PROPERTIES, INC.,

  *Plaintiff-Appellant,*

*v.*

CHESAPEAKE APPALACHIA, L.L.C.,

  *Defendant-Appellee.*

No. 08-5718

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 07-00030—Amul R. Thapar, District Judge.

Argued:  April 28, 2009

Decided and Filed:  June 8, 2009

Before:  MERRITT, COOK, and WHITE, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Eldred Edward Adams, Jr., ADAMS & ADAMS, Louisa, Kentucky, for Appellant.  Leigh Gross Latherow, VanANTWERP, MONGE, JONES, EDWARDS & McCANN, LLP, Ashland, Kentucky, for Appellee.  **ON BRIEF:**  Eldred Edward Adams, Jr., ADAMS & ADAMS, Louisa, Kentucky, for Appellant.  Leigh Gross Latherow, Keri E. Lucas, VanANTWERP, MONGE, JONES, EDWARDS & McCANN, LLP, Ashland, Kentucky, for Appellee.

COOK, J., delivered the opinion of the court, in which MERRITT, J., joined. WHITE, J. (pp. 12-15), delivered a separate opinion joining in the affirmance.

───────────────

## OPINION

───────────────

COOK, Circuit Judge.  In 1968, the heirs of J. H. Northup, predecessors in interest to appellant Northup Properties, Inc. ("Northup"), executed an oil-and-gas lease of 4,327 acres in Kentucky (the "Lease") to United Fuel and Gas Company, the predecessor in

interest to appellee Chesapeake Appalachia, L.L.C. ("Chesapeake"). For nearly forty years, no lessee—including Chesapeake—marketed either oil or gas from the leased property. Northup then filed suit in Kentucky state court for a judgment declaring the Lease null and void. Chesapeake removed the case on the basis of diversity jurisdiction, and the two parties filed cross-motions for summary judgment. After a hearing, the district court granted summary judgment for Chesapeake and denied Northup's motion. Northup appealed, and we affirm.

## I.

Neither party disputes the facts in this case. In relevant part, the Lease contains the following provisions:

> It is agreed that this lease shall remain in force for the term of ten (10) years from this date *and* as long thereafter as the said land is operated by the Lessee in the search for or production of oil or gas, with an extended term by payment of rentals as hereinafter set forth.
>
> . . .
>
> In the event that Lessee does not market the gas from said premises, Lessee is to pay delay rental until such time as the gas is marketed.
>
> . . .
>
> Lessee shall pay the Lessor a rental at the rate of $1.00 per acre per annum payable quarterly in advance beginning three months from the date hereof, *in lieu of development of the entire leased acreage*; provided, however, that each gas well drilled by Lessee on any portion of said land, *whether the same be productive or non-productive,* shall liquidate and abate said delay rental with reference to 250 acres of the leased premises.
>
> . . .
>
> It is agreed that said Lessee may drill or not drill on said lands as it may elect, and the consideration and rentals paid and to be paid constitute adequate consideration for such privilege.

Within the initial ten years (or "primary term") of the Lease, Chesapeake drilled three wells on the property that yielded neither oil nor gas. No other drilling occurred, and Chesapeake plugged two of the original wells. Northup has yet to receive any oil or gas royalty as a result of the Lease. In fact, since the Lease began, the only pecuniary benefit to Northup arises from what Northup terms "nominal" delay-rental payments of $1.00-per-acre each

year. This "nominal payment" amounted to approximately $4,300 each year, or $164,430 for thirty-eight years.

Northup accepted a quarterly delay-rental payment in January 2006, but the next two quarterly payments never arrived. When Chesapeake eventually tendered another payment in December of the same year, Northup returned the check and notified Chesapeake that it considered the Lease "expired by its own terms and therefore . . . terminated at will," and requested that Chesapeake execute a release "in order to remove any possible cloud on the estate." In defense of the Lease's validity, Chesapeake pointed to its payment of delay rentals—and Northup's acceptance of the same—for nearly four decades.

After Northup filed suit in state court seeking to quiet title, Chesapeake removed the case on the basis of diversity jurisdiction. Northup contested the removal, arguing that the case failed to satisfy the amount in controversy, but the district court denied Northup's motion to remand. The parties filed joint stipulations and then cross-motions for summary judgment. After a hearing, the district court concluded that the Lease did not terminate by its own terms and granted summary judgment for Chesapeake. After unsuccessfully moving to alter, amend, or vacate the judgment, Northup timely appealed.

## II.

In denying Northup's motion to remand, the district court credited the affidavit of Chesapeake's petroleum engineer, John D. Adams, which stated that the amount in controversy exceeded $75,000 as required by 28 U.S.C. § 1332(a). Specifically, Adams estimated: (1) the "future cash flows" from the natural gas well at $168,147; (2) the discounted present value of the well as between $106,874 and $131,426; (3) the value of the remaining undeveloped acreage of the entire leasehold estate at $426,700; and (4) the initial cost of drilling the well as exceeding $75,000. We review determination of subject matter jurisdiction de novo. *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 404 (6th Cir. 2007). The burden is on Chesapeake to show by a preponderance of the evidence that the allegations in the complaint at the time of removal satisfy the amount-in-controversy requirement. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir. 2001). The district court concluded that Chesapeake's "anticipated loss, as set forth in the Adams affidavit, exceeds the jurisdictional minimum," and we agree.

The parties' dispute turns on how to ascertain the amount in controversy in a case where the litigation does not seek monetary damages, but declaratory or injunctive relief—here, the cancellation of a lease—involving a mineral interest. One principle is well-settled: for actions seeking a declaratory judgment, we measure the amount in controversy by "the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977); *see, e.g.*, *Cincinnati Ins. Co. v. Zen Design Group, Ltd.*, 329 F.3d 546, 549 (6th Cir. 2003). But the question remains whether we understand the value of this Lease as purely a possessory interest in the land or whether we account for the underlying mineral interest. Complicating matters is the fact that the Lease never resulted in the marketing of either oil or gas.

From Chesapeake's perspective, the amount in controversy is not solely a possessory interest but involves the underlying mineral interest. In other words, Chesapeake argues that this court should measure the jurisdictional amount by weighing "Chesapeake's loss of its right to the natural gas contained under the 4,400 acres of land." Pointing to Adams's affidavit, Chesapeake argues that the amount in controversy—including the discounted future cash flow, the leaseholds' minimum value, and the cost to drill the original well—easily exceeds $75,000.

Weighing in Chesapeake's favor is the fact that several courts, when faced with similar facts, apply metrics similar to those used by Adams.[1] Those metrics include: (1) the tract's fair market value, *see Occidental Chem. Corp. v. Bullard*, 995 F.2d 1046, 1048 (11th Cir. 1993) (using fair market value in assessing the amount in controversy, even though that value exceeded the contract price); *Thomas Well Serv., Inc. v. Williams Natural Gas Co.*, No. 93-4090-SAC, 1993 WL 393708, at *2 (D. Kan. Sept. 8, 1993); *Perrin v. Tenneco Oil Co.*, 505 F. Supp. 23, 25 (W.D. Okla. 1980); *Ehrenfeld v. Webber*, 499 F. Supp. 1283, 1293–94 (D. Me. 1980) (finding the amount-in-controversy

---

[1]This circuit has yet to decide whether we view the amount in controversy from the perspective of the plaintiff or the defendant. *See, e.g.*, *Everett v. Verizon Wireless, Inc.*, 460 F.3d 818, 829 (6th Cir. 2006) (noting the controversy); *Olden v. LaFarge Corp.*, 383 F.3d 495, 503 n.1 (6th Cir. 2004) (same). But we need not decide that question here because we calculate the amount in controversy by accounting for the mineral interest in the land, and not merely the possessory interest (or the value of the rentals). *See Petrey v. K. Petroleum, Inc.*, No. 07-168, 2007 WL 2068597, at *3 (E.D. Ky. July 16, 2007) (concluding that the "value of the item to be obtained" was "sole interest" of the minerals, and examining "the value attached to the interest by the defendant if that party offers competent evidence of its value").

requirement unsatisfied where an expert witness testified that the market value of the tracts at issue amounted to $3,500); (2) both fair market value and net value of the mineral interest, *Ladner v. Tauren Exploration, Inc.*, No. 08-1725, 2009 WL 196021, at *2–3 (W.D. La. Jan. 27, 2009); and (3) the diminished value of the land burdened with an oil-and-gas lease or the increased value without the lease, *A.C. McKoy, Inc. v. Schonwald*, 341 F.2d 737, 739 (10th Cir. 1965).

Of course, accounting for mineral interests is not an exact science. The Supreme Court acknowledged as much in *ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989), noting that a "possible distinction between mineral leases and the lease of lands for other purposes is that mineral rights can be difficult to appraise." *Id.* at 628 n.3. Even so, the Court maintained that the speculative character of such interests "does not defeat the existence of a 'market value' in mineral rights." *Id.* (citing *Mont. Ry. Co. v. Warren*, 137 U.S. 348, 352–53 (1890)). And as the Seventh Circuit observed in a tax context, a mineral lease is not "worthless"—even in a tract where a sole well lies abandoned—as long as some possibility exists to drill other wells that "might result in finding oil and gas in productive quantities." *Davis v. C.I.R.*, 241 F.2d 701, 703 (7th Cir. 1957). Indeed, the *Davis* court rejected the Tax Court's argument that "stopping work on the one well was an abandonment of the entire leasehold, and proof of the lack of value of the entire lease at that time." *Id.* at 703–04.

Here, Chesapeake's affidavits prevent the accounting of the mineral interest from becoming a matter of judicial star-gazing. *See Frystak v. Cabot Oil & Gas Corp.*, 2008 WL 2357744, at *3 (M.D. Pa. June 5, 2008) (accepting an affidavit equating the jurisdictional amount with the value of the lease and contending that "the full value of the object of the litigation exceed[ed] $75,000"). Because Chesapeake convinces us that the amount in controversy more likely than not exceeds the jurisdictional minimum of $75,000, the district court properly denied Northup's motion to remand.

III.

Proceeding to the merits, we review de novo the grant of summary judgment, including all relevant issues of law. *See Jones v. Potter*, 488 F.3d 397, 402 (6th Cir. 2007). Drawing all inferences in Northup's favor, we will affirm where no genuine issue exists as to any material fact and Chesapeake is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

Northup first argues that the Lease expired by its own terms after the primary term concluded,[2] and that Chesapeake cannot force Northup to extend the Lease by the payment of "nominal" delay rentals. But we reject this argument, concluding that the Lease expressly allows for extension by payment of delay rentals.

A brief historical excursus underscores the uniqueness of the Lease's terms. Oil-and-gas leases contemporary to the Lease often followed a form known as a "Producer's 88." *See* Owen L. Anderson et. al., *Hemingway Oil & Gas L. & Taxation* § 6.2 (4th ed. 2004) ("*Hemingway Oil & Gas*"). A Producer's 88 lease customarily provides that the primary term "*shall* terminate upon any anniversary date of the lease during its primary term, *unless* the lessee either pays the delay rental then due or commences the operations for the drilling of a well prior to each such date." *Hemingway Oil & Gas* § 6.2. If such operations occurred, a secondary term would ensue that typically depended on mineral production for continued existence. Ordinarily, the primary term involved a definite number of years for exploration and development of the minerals, while the secondary term included an "as long as" or "so long as" clause that "operate[d] to extend the lease . . . *as long as* oil or gas [was] produced by the lease." Williston H. Symonds, Note, *The*

---

[2] Kentucky law sets forth three grounds by which an oil and gas lessee may lose interest in a lease: (1) forfeiture incident to breach of an express or implied covenant or obligation of the lease; (2) abandonment, or the intentional and actual relinquishment of the leased premises; and (3) the lease terminating by its own terms. *Hiroc Programs, Inc. v. Robertson*, 40 S.W.3d 373, 377 (Ky. Ct. App. 2000). Northup clarifies in its Reply Brief that it is not contending that the Lease terminated due to either forfeiture or abandonment.

*Michelangelo of the Oklahoma Oil & Gas Industry: The Cessation of Production Clause, Spontaneous Lease Terminations, and Cyclical or Marginal Production Problems*, 17 Okla. City U. L. Rev. 413, 415–16 (1992) (emphasis added).  The secondary term allowed the lessee to recover minerals on the lease without the risk of sudden termination.  *Id.* at 415.

The Lease does not follow the typical Producer's 88 form, and its very language confirms that delay rentals extended the Lease.  Rather than including a habendum clause that sets forth a secondary term holding the lease "as long as," or "so long as," oil or gas is produced, *see Hemingway Oil & Gas* § 6.4, the Lease explicitly acknowledges that delay rental payments extend the contract through a secondary term:

> It is agreed that this lease shall remain in force for the term of ten (10) years from this date *and* as long thereafter as the said land is operated by the Lessee in the search for or production of oil or gas, with an *extended term* by *payment of rentals* as hereinafter set forth.

The Lease's discussion of a secondary term held by delay rentals does not include any language equivalent to the typical "as long as" or "so long as" production phrases. Rather, it provides:

> In the event that Lessee does not market the gas from said premises, Lessee is to pay delay rental *until such time* as the gas is marketed.

The Lease's very language contemplates the possibility of gas *not* being produced from the lease—and the Lease extending by way of delay rentals.

Northup's arguments to the contrary are meritless.  Northup cites *Hiroc Programs, Inc. v. Robinson*, 40 S.W.3d 373 (Ky. Ct. App. 2000), for a discussion of the term "marketed," arguing that the duty to market requires due diligence and a good-faith effort to market gas.  *Id.* at 378.  But the lease in *Hiroc* included a habendum clause that specifically provided: "The life of this lease shall extend *as long as* oil or gas is marketed from the property hereby leased."  *Id.*  A case that includes a habendum clause dictating that the lease term turns on production is inapposite to the Lease here, which includes no such language.  Next, Northup points to *Vaughn v. Hearrell*, 347 S.W.2d 542 (Ky. 1961), arguing that the lessee in that case unsuccessfully "attempted to extend

the lease by the payment of delay rentals by relying on language in the lease that seemed to grant an open ended option to extend the lease beyond the primary term by continuing the payment of delay rental." But *Vaughn* merely dictates that Kentucky law will not extend a lease by delay rentals where the habendum clause contains "indirect, ambiguous, and negative language." *Id.* at 544 (citation and quotation marks omitted). Here, there is an *express* provision that discusses the payment of delay rentals to extend the Lease. Finally, Northup contends that to interpret the Lease as subject to extension by delay rentals would render the ten-year primary lease term meaningless—but the Lease's ten-year requirement still carries meaning because it forces a lessee to make some attempt at developing the land.

The plain language of the Lease—a negotiated document, and not a Producer's 88 lease—suggests that delay rentals may extend the Lease's terms. Indeed, the parties' conduct suggests that they understood the Lease to extend upon payment of delay rentals; Chesapeake paid the rentals without contest for over thirty years, and Northup became a successor-in-interest *after* the time when it now alleges that the Lease terminated. We conclude that the district court properly held that the Lease expressly provides for extension by payment of delay rentals.

B.

Next, Northup argues that the district court erred in granting summary judgment for Chesapeake because the Lease is void as contrary to public policy. According to Northup, Chesapeake is attempting to create a permanent lease by its tender of delay rentals after the end of the ten-year initial term. Such leases, Northup argues, are contrary to public policy as set forth in Kentucky Revised Statute ("KRS") § 353.500. Specifically, KRS § 353.500 notes that Kentucky public policy is "to encourage exploration for [mineral] resources . . . and to encourage the maximum recovery of all oil and gas from all deposits thereof now known and which may hereafter be discovered." KRS § 353.500(1). And arguing by analogy, Northup cites to a utility-contract case, *Electric & Water Plant Board of the City of Frankfort v. South Central Bell Telephone Co.*, 805 S.W.2d 141 (Ky. Ct. App. 1990), which notes that "Kentucky

law does not favor contracts running into perpetuity," and will void such clauses as contrary to public policy. *Id.* at 143. In *South Central Bell*, the contract at issue contained "no language explaining how long the [agreement would] continue," and "[a]s worded, the arrangement [would] continue forever." *Id.* Given that Chesapeake has held the Lease for forty years without oil or gas production, Northup argues that the Lease is permanent or perpetual, and thus contrary to Kentucky public policy. We reject this argument.

The district court properly observed that the Kentucky statute "focuses on the importance of the conservation of all mineral resources, the exploration of such resources, and the importance of preventing waste and unnecessary surface loss," and not "long-standing contractual relationships between lessors and lessees." As the court noted, Northup failed to cite to KRS § 353.720, which warns against construing KRS § 353.500 as "superseding, impairing, abridging or affecting any contractual rights or obligations now or hereafter existing between the respective owners of oil, gas, coal, or other minerals, or any interests therein." KRS § 353.720(2).

In *Wheeler v. Lemaster Oil & Gas Co. v. Henley*, 398 S.W.2d 475 (Ky. Ct. App. 1965), the Kentucky Court of Appeals held that it "recognize[d] a strong policy against a lessee holding land for an unreasonable length of time simply for speculative purposes, or because of a lack of due diligence," but that holding resulted "where the lessor's *only revenue* result[ed] from royalty payments received from continued production." *Id.* at 477. Such is not the case here. For thirty years, Chesapeake paid delay rentals, which, according to *Hemingway Oil & Gas*, "may be of substantial value where large tracts of land are involved." *Hemingway Oil & Gas* § 2.3. In fact, the treatise adds that "[w]here no production is obtained, the right to delay rentals may well be the most valuable right of the owner of the mineral estate." *Id.*

Hemingway acknowledges that "[l]ong-term leases are discouraged in the oil-and-gas industry because of the migratory character of substance." *See id.* § 6.2 ("[U]ndeveloped petroleum may be drained by production from adjacent lands. For this reason the industry soon abandoned fee conveyance or long-term leases."). But here, the

policy to uphold the bargain struck between the parties—parties who likely understood the migratory nature of oil and gas—favors Chesapeake's position. *See Collings v. Scheen*, 415 S.W.2d 589, 593 (Ky. Ct. App. 1967) ("The essential thing is for the court to look at the contract from the standpoint of the parties at the time they executed it, and the purpose they had in view in doing so."). The predecessors in interest to the Lease bargained for a contract that allowed for extension by rentals, and rejected use of a form contract (like a Producer's 88) in order to include clauses that provided for such delay rentals. We conclude that the Lease does not violate Kentucy public policy.

## C.

Finally, Northup challenges the district court's summary judgment on the ground that the Lease lacks mutuality of obligation. Essentially, Northup construes Chesapeake as seeking a "unilateral right" to extend an expired lease by tendering quarterly payments. But as the district court observed, the "lessors had a remedy if they were so disposed to avail themselves of it by giving sufficient notice to the lessee and demanding production within a reasonable time." Although the *requirement* of giving notice only arises in Kentucky forfeiture cases, *see Hiroc*, 40 S.W.3d at 377–78, the *right* of providing a notice and demand on the lessee is available where a lessor determines that property lies undeveloped despite a reasonable time for development. *See, e.g.*, *Mid-South Oil Co. v. Jaynes*, 271 S.W. 553, 554 (Ky. 1925); *Maverick Oil & Gas Co. v. Howell*, 237 S.W. 40, 43 (Ky. 1922). Moreover, in *Leeper v. Lemon G. Neely Co.*, 293 F. 967 (6th Cir. 1923), this court noted that the "Kentucky rule, . . . which imports into every oil lease . . . a condition that it shall continue for only a reasonable time, unless by the lessor's continuing consent, seems to remove every aspect of unfairness or one-sidedness that has sometimes been the basis for claiming illegality." *Id.* at 970. Here, Northup offered its "continuing consent" by accepting delay-rental payments for decades without demanding production. Although Northup retains its right to notify Chesapeake of its demand for production, we conclude that the Lease is not void for lack of mutuality.

IV.

By its own terms, the Lease provided for extension by payment of delay rentals, and the Lease survives both public-policy and mutuality challenges.  As a result, we affirm the grant of summary judgment for Chesapeake.

---

**CONCURRENCE**

---

WHITE, Circuit Judge, concurring.   I join in the affirmance, although my reasoning differs somewhat from the majority's.

I

As to the question of jurisdiction, Chesapeake submitted an affidavit purporting to estimate the present value of the natural gas reserves for Well 820584, net of expenses and production taxes, at between $106,874 and $131,426, depending on the rate of discount to present value.  The affidavit also placed an estimated $426,700 value on the "undeveloped acreage," and asserted that the cost of drilling the well was in excess of $75,000.  Northup challenged the affidavit by 1) arguing that no royalties had ever been paid under the lease, 2) questioning the affiant's qualifications and the bases for his opinions, 3) producing evidence that the well was abandoned, and 4) asserting that the yearly delay rental of $4,327.00, rather than projected profits, should control.  Northup offered no alternative value other than the delay rental.

I agree with Northup that the cost of drilling the well is irrelevant, except insofar as that cost affects the value of the leasehold interest.  Yet, I also agree with the majority that the value of the leasehold interest is not necessarily the same as the rentals to be paid under the lease.  The value of the leasehold interest would, I think, be reasonably based on the likelihood of recovering oil and gas, the value of the oil and gas that might be recovered, the timing of such recovery, the costs of recovery and sale, the expenses of delay, and any other factors normally considered by persons engaged in the enterprise of valuing such interests.  Chesapeake's affidavit could have addressed these factors more clearly, but Northup's arguments against jurisdiction did not fatally undermine the affidavit, and under all the circumstances, I agree that Chesapeake established that more likely than not, the amount in controversy exceeds $75,000.

II

I also reach the same conclusion as the majority on the merits. The parties entered into stipulations of fact and submitted the matter to the district court on cross-motions for summary judgment. Northup conceded at argument that it contemplated that the district court would decide the case one way or the other on the stipulations, motions, and briefs, and without trial. Because I find that the lease is ambiguous regarding the question at issue, I conclude that neither party was entitled to summary judgment solely on the agreement. However, because the district court was authorized by the parties to decide the case based on the submissions, and the court's decision finds adequate factual support in the stipulated record and is consistent with the controlling law, I concur in the affirmance. *Cf. Situation Mgmt. Sys., Inc. v. ASP. Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009) ("In a case stated, the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record. The court is then entitled to engage in a certain amount of factfinding, including the drawing of inferences." (quotation marks and citations omitted)).

Under Kentucky law, a contract is ambiguous if it is "capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981). I find the lease ambiguous with respect to whether the payment of delay rentals is sufficient to extend the primary term without regard to the "search for or production of oil or gas." The lease can be read as set forth by the majority, or it can be read as providing that the lease term is ten years, and thereafter for as long as the lessee is engaged in the search for or production of oil or gas on the land, with that extended term being conditioned on the payment of rentals under the lease.

The final portion of the habendum clause refers to "an extended term by payment of rentals as hereinafter set forth," not specifically payment of *delay* rentals. The word "rentals" in a clause extending the lease term can be read to refer to royalties payable under the lease. *See Vaughn v Hearrell,* 347 S.W.2d 542, 544-45 (Ky. 1961) (quoting 2 *Summers on Oil and Gas* § 302, at 278-79, § 351, at 482-83); *see also* 2 W.L. Summers, *The Law of Oil and Gas: With Forms* § 14:22 (3d ed. 2006) ("It was urged

that the term 'rental' in this context meant the delay rental provided for in the drilling clause. But that interpretation would permit the lessee to indefinitely postpone development of the premises by the payment of delay rental . . . . When the question was presented to the courts, they uniformly held that the rental referred to in this clause was not delay rental provided for in the drilling clause, but gas or oil rentals to be paid to the lessee after production, and that the lessee could not extend the lease beyond the definite term by the tender or payment of delay rentals." (citing cases)). Additionally, the lease provides for abatements of the delay rentals based on the number of gas or oil wells drilled. Thus, it is not unreasonable to contemplate that the lessee would be producing and searching for oil and gas, paying royalties, and paying delay rentals all at the same time. Further, the "drill or not drill" clause can be read as applying during the primary term of the lease. All of which is to say that these additional provisions are themselves subject to different interpretations and do not dictate that the habendum clause be read one way or the other.

Taking into account both the terms of the lease and Kentucky case law with respect to oil and gas leases, it would be reasonable to read the lease-term provision and habendum clause as providing that the lease terminates after ten years (i.e., "this lease shall remain in force for the term of ten (10) years"), unless the land is then operated by the lessee in the search for or production of oil or gas (i.e., "and as long thereafter as the said land is operated by the Lessee in the search for or production of oil or gas"), in which case the lease can be extended for terms coincident with the obligation to pay rentals under the lease by the payment of those rentals (i.e., "with an extended term by payment of rentals as hereinafter set forth").

That said, I agree with the majority that the lease at issue here differs in relevant respects from the Producer's 88 leases involved in the cases Northup relied on. Most relevant is that the lease does not contain a typical "drilling clause," requiring that the lessee begin drilling within a specific period of time.

Were the case not submitted to the district court for decision on the stipulated facts, the parties' motions, and their briefs, I would conclude that summary judgment for

either party is inappropriate.  However, because the case was so submitted, and the parties contemplated that the court would decide the case without trial, I agree that the judgment should be affirmed.  Taking the ambiguous lease together with the approximately thirty-year course of conduct after the alleged expiration of the lease,[1] there was adequate support for the district court's determination that the lease had not terminated on its own at the conclusion of the primary term.

---

[1]When a contract is ambiguous, Kentucky courts apply the doctrine of "contemporaneous construction." *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1981).  Under this doctrine, "'courts are required to give great weight to the interpretation which the parties have placed on an ambiguous contract.  The construction of the parties is best evidenced by their conduct with respect to the agreement.'" *Id.* (quoting *Billips v. Hughes*, 259 S.W.2d 6, 7 (Ky. 1953)).