## ASARCO INC. ET AL. *v.* KADISH ET AL.

No. 87–1661.   Argued February 27, 1989—Decided May 30, 1989

606

KENNEDY, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Part I, in which all participating Members joined, the opinion of the Court with respect to Parts II–A, II–B–2, II–C, III, and IV, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and an opinion with respect to Part II–B–1, in which REHNQUIST, C. J., and STEVENS and SCALIA, JJ., joined. BRENNAN, J., filed an opinion concurring in part and concurring in the judgment, in which WHITE, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 633. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in

part, in which SCALIA, J., joined, *post*, p. 634.   O'CONNOR, J., took no part in the consideration or decision of the case.

*Daniel M. Gribbon* argued the cause for petitioners.   With him on the briefs were *William H. Allen, Elizabeth V. Foote, Burton M. Apker,* and *Howard A. Twitty.*

*David S. Baron* argued the cause for respondents.   With him on the brief was *Kevin J. Lanigan.*

*Christopher J. Wright* argued the cause for the United States as *amicus curiae* urging affirmance.   With him on the brief were *Solicitor General Fried, Assistant Attorney General Marzulla, Deputy Solicitor General Wallace, Robert L. Klarquist,* and *J. Carol Williams.**

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part II–B–1.

The ultimate question for our decision is whether Arizona's statute governing mineral leases on state lands is void because it does not conform with the federal laws that originally granted those lands from the United States to Arizona. First, however, there is a difficult question about our own jurisdiction, a matter which touches on essential aspects of the proper relation between state and federal courts.

---

*Briefs of *amici curiae* urging reversal were filed for Clinton Campbell Contractor, Inc., d/b/a Phoenix Brick Yard, by *Calvin H. Udall* and *Nancy L. Rowen;* and for the Alaska Miners Association et al. by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* was filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Jan S. Stevens,* Supervising Deputy Attorney General, and *Mary L. Holt,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *Jim Jones* of Idaho, *Marc Racicot* of Montana, *Hubert H. Humphrey III* óf Minnesota, *Hal Stratton* of New Mexico, *Nicholas J. Spaeth* of North Dakota, *Robert Henry* of Oklahoma, *Roger A. Tellinghuisen* of South Dakota, *R. Paul Van Dam* of Utah, *Kenneth O. Eikenberry* of Washington, and *Joseph B. Meyer* of Wyoming.

## I

Various individual taxpayers and the Arizona Education Association, which represents approximately 20,000 public schoolteachers throughout the State, brought suit in Arizona state court, seeking a declaration that the state statute governing mineral leases on state lands, Ariz. Rev. Stat. Ann. § 27–234(B) (Supp. 1988), is void, and also seeking appropriate injunctive relief. The state statute was challenged on the ground that it does not comply with the methods Congress required the State to follow before it could lease or sell the lands granted from the United States in the New Mexico-Arizona Enabling Act of 1910, 36 Stat. 557, and which are repeated in the Arizona Constitution. The suit was brought against the Arizona Land Department and others. ASARCO Incorporated and other current mineral lessees of state school lands were permitted to intervene as defendants. Eventually the trial court certified the case as a defendant class action under Arizona Rule of Civil Procedure 23. The defendant class consisted of all present and future mineral lessees of state lands.

The trial court upheld the statute on cross-motions for summary judgment, and respondents (the original plaintiffs) appealed. The Arizona Supreme Court reversed over the dissent of one justice, ruling that the statute is "unconstitutional and invalid as it pertains to nonhydrocarbon mineral leases." *Kadish* v. *Arizona State Land Dept.*, 155 Ariz. 484, 498, 747 P. 2d 1183, 1197 (1987). It remanded the case to the trial court with instructions to enter summary judgment for respondents, to enter a judgment declaring § 27–234(B) invalid, and to consider what further relief, if any, might be appropriate.

Various of the mineral lessees filed a petition for certiorari, and we granted review. 488 U. S. 887 (1988).

## II

Before we may undertake to consider whether the state legislation authorizing the leases is valid under federal law,

we must rule on whether we have jurisdiction in the case. The parties and *amici* raise three jurisdictional issues, each of substance. We would be required, of course, to raise these matters on our own initiative if necessary, for our legitimate exercise of judicial power is confined both by statutes and by Article III of the Constitution. The issues here are: first, whether the judgment below is final; second, whether there is standing and an actual case or controversy that permits of a decision in federal court; and third, whether the decision below is unreviewable in this Court because it rests on an adequate and independent state ground.

A

The first jurisdictional question is whether the Arizona Supreme Court issued a final judgment in the case. It granted plaintiffs a declaratory judgment that the state law governing mineral leases is invalid, but then remanded the case for the trial court to determine "just what further relief is appropriate." 155 Ariz., at 498, 747 P. 2d, at 1197. The United States, as *amicus*, asserts that the validity of existing leases remains at issue and that the trial court may yet decide to uphold the leases on the ground that they were made for "true value," and thus are in "substantial conformity" with the provisions of the Enabling Act, § 28, 36 Stat. 574–575, even though the leasing procedures did not comply with every specific requirement in the Act. Brief for United States as *Amicus Curiae* 10–14 (hereafter Brief for United States).

If the assertion were correct, the judgment below would not yet be final within the meaning of 28 U. S. C. § 1257, and we would lack jurisdiction in the case. But it is not correct. Respondents originally sought a declaratory judgment that the state law is invalid, an injunction against further leases, and an accounting and payment of sums due under past leases; but they withdrew the last request on appeal to the Arizona Supreme Court. See Brief for Appellant in *Kadish* v. *Arizona State Land Dept.*, CV-86–0238-T, p. 6, n. 3, p. 40.

Thus, on remand the trial court does not have before it any federal question whether past and current leases are valid because they were made in "substantial conformity" with the terms of the Enabling Act. And, of course, the trial court's further actions cannot affect the Arizona Supreme Court's ruling that § 27–234(B) is invalid. Accordingly, the judgment below comes within two of the exceptions to the finality requirement that were set out in *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975). Here "the federal issue is conclusive" and "the outcome of further proceedings preordained." *Id.*, at 479; see also *Duquesne Light Co.* v. *Barasch*, 488 U. S. 299 (1989). In addition, the "'federal questions that could come here have been adjudicated by the State court,'" and the remaining issues, contrary to the United States' suggestion, will not give rise to any further federal question. *Cox, supra,* at 480, quoting *Radio Station WOW, Inc.* v. *Johnson*, 326 U. S. 120, 127 (1945).

### B

The second jurisdictional issue is of some theoretical import, though infrequent in occurrence. The question is whether, under federal standards, the case was nonjusticiable at its outset because the original plaintiffs lacked standing to sue; and if so, whether we may examine justiciability at this stage because the Arizona courts heard the case and proceeded to judgment, a judgment which causes concrete injury to the parties who seek now for the first time to invoke the authority of the federal courts in the case.

### 1

The United States contends that the case should be dismissed for lack of standing, since neither respondent taxpayers nor respondent teachers association, who were the original plaintiffs, would have satisfied the requirements for bringing suit in federal court at the outset. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular is-

sues." *Warth* v. *Seldin*, 422 U. S. 490, 498 (1975). Although standing in its outer dimensions is a prudential concept to be shaped by the decisions of the courts as a matter of sound judicial policy and subject to the control of Congress, at its core it becomes a constitutional question; for standing in its most basic aspect can be one of the controlling elements in the definition of a case or controversy under Article III. See *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U. S. 464, 471–476 (1982); *id.*, at 490–494 (BRENNAN, J., dissenting). The standing of respondents if they had filed suit in federal court at the trial level may be resolved by applying well-settled principles of federal law.

The question whether taxpayers or citizens have a sufficient personal stake to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens covers old and familiar ground. As an ordinary matter, suits premised on federal taxpayer status are not cognizable in the federal courts because a taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for [judicial intervention]." *Frothingham* v. *Mellon*, 262 U. S. 447, 487 (1923) (decided with *Massachusetts* v. *Mellon*).

We have indicated that the same conclusion may not hold for municipal taxpayers, if it has been shown that the "peculiar relation of the corporate taxpayer to the [municipal] corporation" makes the taxpayer's interest in the application of municipal revenues "direct and immediate." *Frothingham, supra*, at 486–487, citing *Crampton* v. *Zabriskie*, 101 U. S. 601, 609 (1880). Yet we have likened state taxpayers to federal taxpayers, and thus we have refused to confer standing upon a state taxpayer absent a showing of "direct injury,"

pecuniary or otherwise.  *Doremus* v. *Board of Education of Hawthorne*, 342 U. S. 429, 434 (1952).

No such showing has been made in this case, and respondent taxpayers do not allege any special circumstances or exceptions that would confer standing upon them.   Instead, they have simply asserted that the Arizona statute governing mineral leases has "deprived the school trust funds of millions of dollars thereby resulting in unnecessarily higher taxes." Complaint ¶ III.   Even if the first part of that assertion were correct, however, it is pure speculation whether the lawsuit would result in any actual tax relief for respondents.   If they were to prevail, it is conceivable that more money might be devoted to education; but since education in Arizona is not financed solely from the school trust fund, Tr. of Oral Arg. 8–10, the State might reduce its supplement from the general funds to provide for other programs.   The possibility that taxpayers will receive any direct pecuniary relief from this lawsuit is "remote, fluctuating and uncertain," as stated in *Frothingham, supra*, at 487, and consequently the claimed injury is not "likely to be redressed by a favorable decision," *Valley Forge, supra*, at 472.

The same flaw defeats the claim that the teachers association would have had standing to bring this suit originally in federal court.   The association and its members contend that the state law "imposes an adverse economic impact" on them. Complaint ¶ IV.   Yet even if invalidation of the state law would create increased revenue for the school trust funds in the near future, an issue much disputed here, the allegations of economic harm rest on the same hypothetical assumptions as do the taxpayer claims.   If respondents prevailed and increased revenues from state leases were available, maybe taxes would be reduced, or maybe the State would reduce support from other sources so that the money available for schools would be unchanged.   Even if the State were to devote more money to schools, it does not follow that there would be an increase in teacher salaries or benefits.   These

policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise state fiscal policy and myriad other circumstances. Whether the association's claims of economic injury would be redressed by a favorable decision in this case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict. We have much less confidence in concluding that relief is likely to follow from a favorable decision here than we had in cases like *Allen* v. *Wright*, 468 U. S. 737 (1984), and *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S. 26 (1976), where standing was found to be lacking because the probable response of private individuals to explicit tax incentives was judged to be too uncertain to satisfy the redressability prong of federal standing requirements.

Petitioners also argue that the "likelihood" of a redressable injury is increased once it is recognized that the claims of the taxpayers and the teachers association rest upon independent contingencies. The implication is that the Court should cumulate the probabilities, in the event that plaintiffs prevail, of either the taxpayers receiving direct relief from the increased revenues or the teachers receiving indirect economic benefit from higher funding for schools. Reply Brief for Petitioners 14–15. This line of reasoning evokes two responses. First, it does not avoid the fundamental problem that the courts are unable to evaluate with any assurance the "likelihood" that decisions will be made a certain way by policymaking officials acting within their broad and legitimate discretion. Second, the doctrine of standing to sue is not a kind of gaming device that can be surmounted merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves. Instead, the basic inquiry, for *each* party seeking to invoke the authority of the federal courts, *Warth, supra,* at 498–499, is whether that party alleges per-

sonal injury that is fairly traceable to the challenged conduct and likely to be redressed by the requested relief. *Valley Forge*, 454 U. S., at 472.

When the allegations of economic injury are put to one side, the claims made by both the taxpayers and the teachers association reduce to something like the association's contention that the state law undermines "the quality of education in Arizona." Complaint ¶ IV. We cannot say with any certainty that this contention is even likely to be correct. The claims raised here, moreover, are the kind of generalized grievances brought by concerned citizens that we have consistently held are not cognizable in the federal courts. See *Los Angeles* v. *Lyons*, 461 U. S. 95, 111–112 (1983); *Valley Forge, supra*, at 482–487; *Sierra Club* v. *Morton*, 405 U. S. 727, 736–740 (1972); see also *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208 (1974); *United States* v. *Richardson*, 418 U. S. 166 (1974).

Our precedents demonstrate that a party may establish standing by raising claims of noneconomic injury, see, *e. g.*, *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91 (1979); *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972); but claims of injury that are purely abstract, even if they might be understood to lead to "the psychological consequence presumably produced by observation of conduct with which one disagrees," *Valley Forge, supra*, at 485, do not provide the kind of particular, direct, and concrete injury that is necessary to confer standing to sue in the federal courts. Although the members of the teachers association might argue that they have a special interest in the quality of education in Arizona, such a special interest does not alone confer federal standing. Cf. *Sierra Club, supra*, at 739–740. The argument does not succeed in distinguishing the members in this regard from students, their parents, or various other citizens.

Our review discloses no basis on which to find that respondents would satisfy the requirements for federal stand-

ing articulated by our precedents. It follows that the suit would have been dismissed at the outset were the federal rule to apply.

2

But the state judiciary here chose a different path, as was their right, and took no account of federal standing rules in letting the case go to final judgment in the Arizona courts. That result properly follows from the allocation of authority in the federal system. We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law, as when they are called upon to interpret the Constitution or, in this case, a federal statute. See, *e. g.*, *Pennell* v. *San Jose*, 485 U. S. 1, 8 (1988); *Lyons, supra,* at 113; *Doremus,* 342 U. S., at 434; *Secretary of State of Md.* v. *J. H. Munson Co.,* 467 U. S. 947, 971 (1984) (STEVENS, J., concurring); *Bateman* v. *Arizona,* 429 U. S. 1302, 1305 (1976) (REHNQUIST, J., in chambers); cf. *Highland Farms Dairy, Inc.* v. *Agnew,* 300 U. S. 608, 612 (1937).

Although the state courts are not bound to adhere to federal standing requirements, they possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law. See 28 U. S. C. § 1738; *Grubb* v. *Public Utilities Comm'n of Ohio,* 281 U. S. 470 (1930). Indeed, inferior federal courts are not required to exist under Article III, and the Supremacy Clause explicitly states that "the Judges in every State shall be bound" by federal law. U. S. Const., Art. VI, cl. 2.

The question now arises whether a judgment rendered by the state courts in these circumstances can support jurisdiction in this Court to review the case. At this juncture, petitioners allege a specific injury stemming from the state-court decree, a decree which rests on principles of federal law.

Petitioners insist that, as a result of the state-court judgment, the case has taken on such definite shape that they are under a defined and specific legal obligation, one which causes them direct injury.

We agree. Although respondents would not have had standing to commence suit in federal court based on the allegations in the complaint, they are not the party attempting to invoke the federal judicial power. Instead it is petitioners, the defendants in the case and the losing parties below, who bring the case here and thus seek entry to the federal courts for the first time in the lawsuit. We determine that petitioners have standing to invoke the authority of a federal court and that this dispute now presents a justiciable case or controversy for resolution here.

Petitioners hold mineral leases that were granted under the state law the Arizona Supreme Court invalidated. Although no accounting of sums due under these leases remains at issue in this particular case, it is undisputed that the decision to be reviewed poses a serious and immediate threat to the continuing validity of those leases by virtue of its holding that they were granted under improper procedures and an invalid law. The state proceedings ended in a declaratory judgment adverse to petitioners, an adjudication of legal rights which constitutes the kind of injury cognizable in this Court on review from the state courts. See, *e. g.*, *Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249, 261–265 (1933). Petitioners are faced with "actual or threatened injury" that is sufficiently "distinct and palpable" to support their standing to invoke the authority of a federal court. *Warth*, 422 U. S., at 500, 501.

Petitioners contend before us that the Arizona Supreme Court's decision rests on an erroneous interpretation of federal statutes. They claim that the declaratory judgment sought and secured by respondents, along with the relief that may flow from that ruling, is invalid under federal law. If we were to agree with petitioners, our reversal of the deci-

sion below would remove its disabling effects upon them. In these circumstances, we conclude that petitioners meet each prong of the constitutional standing requirements. As the parties first invoking the authority of the federal courts, they have shown that they "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the [other party] . . . and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge*, 454 U. S., at 472 (citations omitted). In addition, petitioners' standing to invoke the authority of this Court is not affected by any of the prudential limitations that have been identified in prior cases. *Id.*, at 474–475. Indeed, the United States appears to recognize the force of these points. See Brief for United States 20, n. 14 ("[I]n light of the decision below, [petitioners] may now have standing" to invoke the authority of a federal court).

We also conclude that "the record shows the existence of a genuine case or controversy essential to the exercise of the jurisdiction of this Court." *Tileston* v. *Ullman*, 318 U. S. 44, 46 (1943). These parties remain adverse, and "valuable legal rights . . . will be directly affected to a specific and substantial degree by the decision of the question of law." *Wallace*, 288 U. S., at 262. We are not confronted, certainly, with parties "attempting to secure an abstract determination by the Court of the validity of a statute . . . or a decision advising what the law would be on an uncertain or hypothetical state of facts," *ibid.*, as might be the case, for example, if petitioners were seeking review of an advisory opinion rendered through specific mechanisms for obtaining a hypothetical ruling from a state court or other state official. The proceedings here were judicial in nature, and resulted in a final judgment altering tangible legal rights. This proceeding constitutes a cognizable case or controversy. Cf. *In re Summers*, 325 U. S. 561, 568–569 (1945).

Although petitioners satisfy the requirements of federal standing and present an actual case or controversy for decision here, the United States contends that this showing is insufficient to support our jurisdiction. The Government suggests that the appropriate order is dismissal, and that petitioners are then free "to bring a declaratory judgment action in federal court" raising these same claims. Brief for United States 20, n. 14. Petitioners counter that if the Court finds it cannot review the judgment on the merits, the proper course is to vacate the judgment below and remand for appropriate further proceedings, Tr. of Oral Arg. 13–15, as we have done at least on some occasions when a case becomes moot while it is pending on review from a state court, see, e. g., *DeFunis* v. *Odegaard*, 416 U. S. 312, 320 (1974). Neither disposition is appropriate here.

If we were to vacate the judgment below on the ground that respondents lacked federal standing when they brought suit initially, that disposition would render nugatory the entire proceedings in the state courts. The clear effect would be to impose federal standing requirements on the state courts whenever they adjudicate issues of federal law, if those judgments are to be conclusive on the parties. That result, however, would be contrary to established traditions and to our prior decisions recognizing that the state courts are not bound by Article III and yet have it within both their power and their proper role to render binding judgments on issues of federal law, subject only to review by this Court.

In addition, we doubt it would be a proper exercise of our authority to vacate the state court's judgment in these circumstances. It would be an unacceptable paradox to exercise jurisdiction to confirm that we lack it and then to interfere with a State's sovereign power by vacating a judgment rendered within its own proper authority. This case is not one committed to the exclusive jurisdiction of the federal courts. We have no authority to grant a writ only to an-

nounce that, solely because we may not review a case, the state court lacked power to decide it in the first instance.[1]

If we were merely to dismiss this case and leave the judgment below undisturbed, a different set of problems would ensue. Although the judgment of a state court on issues of federal law normally binds the parties in any future suit even if that suit is brought separately in federal court, we have occasionally cautioned that such a judgment may well *not* bind the parties if the state court's conclusions about federal law were not subject to any federal review. See, *e. g.*, *Doremus*, 342 U. S., at 434 ("[W]e cannot accept . . . as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute" a case or controversy); *Minnesota* v. *National Tea Co.*, 309 U. S. 551, 557 (1940) (this Court is responsible for assuring "that state courts will not be the final arbiters of important issues under the federal constitution"); *Fidelity Nat. Bank & Trust*

---

[1] The Court's treatment of cases that become moot on review from the lower federal courts, as distinct from those that become moot on review from state courts, is illuminating on this point. In the former situation, the settled disposition of a case that has become entirely moot is for this Court to "vacate the judgment below and remand with a direction to dismiss." *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950). The power to make that disposition is predicated on our "supervisory power over the judgments of the lower federal courts," which "is a broad one." *Id.*, at 40. In the latter situation, on review of state judgments, the same disposition is not made. Traditionally, where the entire case had become moot, the Court vacated the judgment below and remanded for such further proceedings as the state court might deem appropriate, as in *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974), since the state courts, not bound by Article III, were free to dispose of the case in a variety of ways, including reinstatement of the judgment. More recently, however, the regular practice in the latter situation has been to dismiss the case and leave the judgment of the state court undisturbed, which evinces a proper recognition that in the absence of any live case or controversy, we lack jurisdiction and thus also the power to disturb the state court's judgment. See, *e. g.*, *Kansas Gas & Elec. Co.* v. *State Corp. Comm'n of Kan.*, 481 U. S. 1044 (1987); *Times-Picayune Pub. Corp.* v. *Schulingkamp*, 420 U. S. 985 (1975).

·*Co. of Kansas City* v. *Swope*, 274 U. S. 123, 130–131 (1927) (proceeding in state court is res judicata if "the constitutional rights asserted, or which might have been asserted in that proceeding, could eventually have been reviewed here"). The predominant interest promoted by this apparent exception to normal preclusion doctrines is to assure that the binding application of federal law is uniform and ultimately subject to control by this Court. See *Richardson* v. *Ramirez*, 418 U. S. 24, 42, n. 13 (1974) (this Court may review a declaratory judgment granted by a state court, for "any other conclusion would unnecessarily permit a state court of last resort, quite contrary to the intention of Congress in enacting 28 U. S. C. § 1257, to invalidate state legislation on federal constitutional grounds without any possibility of state officials who were adversely affected by the decision seeking review in this Court").

Given the likelihood that dismissal in this case would defeat the normal preclusive effects of the state court's judgment, however, the effect again would be to impose federal standing requirements on a state court that sought to render a binding decision on issues of federal law. It also would denigrate the authority of the state courts by creating a peculiar anomaly in the normal channels of appellate review. The *Rooker-Feldman* doctrine interprets 28 U. S. C. § 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court, for such authority is vested solely in this Court. *District of Columbia Court of Appeals* v. *Feldman*, 460 U. S. 462 (1983); *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281, 296 (1970); *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413, 415–416 (1923). The United States urges that the proper course for petitioners is to sue in federal trial court in order to readjudicate the very same issues that were determined in the state-court proceedings below. Brief for United States 20, n. 14. That action, in essence, would be an attempt to obtain direct review of the Arizona Supreme Court's decision

in the lower federal courts, and would represent a partial inroad on *Rooker-Feldman*'s construction of 28 U. S. C. § 1257.

For these reasons, we believe it would be inappropriate to dismiss the case at this stage.[2] That disposition would come at the cost of much disrespect to state-court proceedings and judgments. It also would require petitioners to commence a new action in federal court to vindicate their rights under federal law, even though right now they present us with a case or controversy that is justiciable under federal standards. Cf. *Wallace*, 288 U. S., at 262–263 (a justiciable controversy is not "any the less so because through a modified procedure appellant has been permitted to present it in the state courts"). Instead, we adopt the following rationale for our decision on this jurisdictional point: When a state court has issued a judgment in a case where plaintiffs in the original action had no standing to sue under the principles governing the federal courts, we may exercise our jurisdiction on certiorari if the judgment of the state court causes direct,

---

[2] None of the precedents cited by the parties, and none that we have found, is squarely on point. In *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984), the original defendant brought an appeal to defend the constitutionality of a state statute declared unconstitutional by the state court, but the Court began by evaluating the standing of the original plaintiffs, as we do here, and found that they did meet the requirements for federal standing, which obviated any further inquiry. *Id.*, at 954–959. The same is not true in this case. In *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239 (1983), the Court found that the original plaintiff met the requirements imposed by Article III, and then refused to invoke the prudential limitation of *jus tertii*, at least in part so as to avoid any question of "leaving intact the state court's judgment in favor of [the original plaintiff], the purportedly improper representative of the third party's constitutional rights." *Id.*, at 243. In *Doremus* v. *Board of Education of Hawthorne*, 342 U. S. 429 (1952), an appeal brought from state court by a *losing* taxpayer plaintiff was dismissed, because in that instance the party seeking to invoke the authority of the federal courts was found to lack standing, as would be true of the taxpayer plaintiffs in this case as well. *Id.*, at 432–435. Yet here petitioners are the injured parties who seek to invoke the authority of this Court, and they meet the federal standing requirements.

specific, and concrete injury to the parties who petition for our review, where the requisites of a case or controversy are also met.

We are not unmindful of the paradox that would result if respondents (plaintiffs below) prevail on the merits, for then they will have succeeded in obtaining a federal determination here that would have been unavailable if the action had been filed initially in federal court. Nonetheless, although federal standing "often turns on the nature and source of the claim asserted," it "in no way depends on the merits of the [claim]." *Warth*, 422 U. S., at 500. The rule we adopt is necessary in deference to the States and in response to the petitioning parties who seek this forum to redress a real and current injury stemming from the application of federal law.

We therefore conclude that we may properly decide this case. Petitioners meet the requirements for federal standing under *Valley Forge*. Because they are the parties first invoking the authority of the federal courts in this case, and an actual case or controversy is before the Court, there is no jurisdictional bar to review. In these circumstances, and having already granted review, we believe the proper course is not to dismiss the case or to vacate the judgment below, but to undertake review of the federal issues on their merits.

## C

The last threshold procedural issue concerns the possibility that the decision below rested on an adequate and independent state ground that would defeat review of the federal issues by this Court. See, *e. g.*, *Fox Film Corp.* v. *Muller*, 296 U. S. 207, 210 (1935). Here the state court mentioned the State Constitution several times in its opinion but otherwise relied exclusively on federal law, including an extended discussion of the applicable federal statutes and their legislative histories. 155 Ariz., at 486–487, 747 P. 2d, at 1185–1186. In its conclusion, however, the Arizona Supreme Court directed the trial court "to enter a judgment declaring

A. R. S. § 27–234 unconstitutional and invalid as it pertains to nonhydrocarbon mineral leases." *Id.*, at 498, 747 P. 2d, at 1197.

We conclude that the opinion below is not based on an adequate and independent state ground. Its discussion focuses solely on the federal statutes, and the State Constitution is never mentioned on its own apart from the Enabling Act. The Arizona Supreme Court explicitly considered itself "bound to adopt the construction advanced by [plaintiffs]" based on the prior decisions of this Court, and described Article 10 of the Arizona Constitution as simply a "rescript" of § 28 of the Enabling Act. *Id.*, at 495–496, 747 P. 2d, at 1194–1195. In light of this description, the references to the Arizona Constitution simply reflect a holding which rests on the state court's interpretation of federal law. Although the Arizona Supreme Court was free to rest its holding on the State Constitution as an independent ground, the decision below did not divorce the state constitutional issue from the questions of federal law. See *Enterprise Irrigation Dist.* v. *Canal Co.*, 243 U. S. 157, 164 (1917); see also 155 Ariz., at 495, 747 P. 2d, at 1194 ("The Enabling Act is the 'fundamental and paramount law' in Arizona," quoting *Murphy* v. *State*, 65 Ariz. 338, 345, 181 P. 2d 336, 340 (1947)).

In sum, we do not lack jurisdiction to review the decision below.

## III

The issue on the merits is whether Arizona may lease mineral lands granted from the United States without meeting the specific requirements imposed by federal statute. We begin with a more detailed review of the statutes in question.

In 1910, Congress passed the New Mexico-Arizona Enabling Act, 36 Stat. 557, which authorized the people of those Territories to form state governments. Among its other provisions, the Enabling Act granted Arizona certain lands within every township for the support of public schools. Congress provided, however, that the new State would hold

those granted lands in trust and subject to the specific conditions set out in § 28 of the Act, 36 Stat. 574–575. Under the conditions, the granted lands could not be sold or leased except to the highest bidder at a public auction following notice by advertisements in two newspapers weekly for 10 weeks. Leases for a term of five years or less were exempt from the advertising requirement. Lands could not be sold or leased for less than the values set by an appraisal required by the statute. All proceeds derived from the lands would go to a permanent segregated fund, and interest, but not principal, was to be spent for support of public schools. Arizona incorporated those restrictions in its proposed constitution, Ariz. Const., Art. 10, and was admitted to the Union in 1912.

The grant of lands in the Enabling Act specifically excluded mineral lands, §§ 6, 24, 36 Stat. 561–562, 572, but this gave rise to uncertainty about what are known as "unknown" mineral lands, those lands on which minerals were not discovered until after the grant. In two subsequent decisions, this Court held that the exclusion applied only to lands known to be mineral at the time of the grant, and that unknown mineral lands *were* granted under the Act. *Wyoming* v. *United States*, 255 U. S. 489, 500–501 (1921); *United States* v. *Sweet*, 245 U. S. 563, 572–573 (1918). These holdings in turn spawned numerous disputes over whether lands were known to be mineral at the time they were granted from the Federal Government. See, *e. g.*, *Work* v. *Braffet*, 276 U. S. 560, 561–563 (1928). Title to lands in many Western States was in doubt, and the issue became more difficult to prove as the years passed. Accordingly, in 1927 Congress passed the Jones Act, 44 Stat. 1026, a brief statute that extended the terms of the original grant of lands in the Western States to encompass mineral lands as well. Congress also has amended the Enabling Act twice, each time to clarify the procedures for leasing granted lands for specific purposes. See Act of June 5, 1936, ch. 517, 49 Stat. 1477; Act of June 2, 1951, 65 Stat. 51.

Arizona's own law governing the leasing of state mineral lands, enacted in 1941, requires every such lease to "provide for payment to the state by the lessee of a royalty of five per cent of the net value of the minerals produced from the claim." Ariz. Rev. Stat. Ann. § 27–234(B) (Supp. 1988). But it does not require those lands to be advertised or appraised before they are leased and does not require the lands to be leased at their full appraised value. The lands in question here were granted to Arizona either in 1910, by the terms of the Enabling Act itself, or in 1927, under the Jones Act.

The grant of all lands under the Enabling Act is conditioned, by the statute's clear language, upon the specified requirements for leasing or selling those lands. The Act declares that "*all lands* hereby granted . . . shall be by the said State held in trust, to be disposed of in whole or in part *only in the manner as herein provided*, . . . and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same." § 28, 36 Stat. 574, 575 (emphasis added). "Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, . . . in any manner contrary to the provisions of this Act, shall be deemed a breach of trust." Any such disposition is expressly stated to be "null and void" unless "made in substantial conformity with the provisions of this Act." *Ibid.* And, again, the requirements set forth in the Act apply to "[a]ll lands, leaseholds, timber, and other products of land." *Ibid.*

Petitioners cite *Neel* v. *Barker*, 27 N. M. 605, 204 P. 205 (1922), as standing for the proposition that because mineral lands originally were exempted by Congress from the grant made in the Enabling Act, its provisions for the sale or lease of granted lands did not apply to those lands later determined to be mineral in nature. That proposition, never tested in a federal court, is flawed in two respects. First, in *Wyoming* v. *United States*, *supra*, decided the year before but not men-

tioned or discussed in *Neel*, this Court held that unknown mineral lands *were* within the grant made by Congress. Second, since those lands were granted to the States under the authority of the Enabling Act itself, they could not be re-. garded as unburdened by its mandatory conditions. In consequence, the New Mexico Supreme Court erred in concluding that because "Congress did not intend to grant to the state any mineral lands . . . it follows that the state is not controlled nor restricted by said act in regard to leasing said lands for mineral purposes." 27 N. M., at 611, 204 P., at 207. All the lands granted under the Act are granted subject to its conditions.[3]

The lands granted under the Jones Act are subject to the same conditions. This very brief enactment was passed to address the continuing problems associated with the dual regime, under which the adjudication of title to lands would depend on whether they were known to be mineral at the time the Federal Government granted them. H. R. Rep. No. 1761, 69th Cong., 2d Sess., 2–3 (1927); S. Rep. No. 603, 69th Cong., 1st Sess., 1–6 (1926). Indeed, its formal title was: "An Act Confirming in States and Territories title to lands granted by the United States in the aid of common or public schools." 44 Stat. 1026. The Jones Act resolved the problem of the dual regime by simply "extend[ing]" the prior grants of lands "to embrace numbered school sections mineral in character." § 1, 44 Stat. 1026. The statute explicitly stated that "the grant of numbered mineral sections under

---

[3] One possible distinction between mineral leases and the lease of lands for other purposes is that mineral rights can be difficult to appraise, which might make the Enabling Act's provisions less helpful in this setting. But this Court recognized long ago that such rights are subject to valuation in condemnation proceedings, and that whatever the difficulties may be in making such appraisals with complete accuracy, it does not defeat the existence of a "market value" in mineral rights, and it does not suffice as a reason to depart from the ordinary requirements that the law imposes on such transactions. *Montana R. Co.* v. *Warren*, 137 U. S. 348, 352–353 (1890).

this Act *shall be of the same effect as prior grants for the numbered non-mineral sections.*"  § 1(a), 44 Stat. 1026 (emphasis added).

Petitioners make two points about the proper reading of this statute.  First, they argue that the "same effect" language was intended only to assure that the title to these lands passed and vested in the same manner and with the same validity as did the title to lands granted under the Enabling Act, but said nothing about the conditions upon which those lands were granted.  Second, they argue that the language of § 1(b) of the Jones Act granted the States a broad authority to lease the mineral deposits in the newly granted lands "by the State as the State legislature may direct," with "the proceeds of rentals and royalties therefrom to be utilized for the support or in aid of the common or public schools." 44 Stat. 1026–1027.  According to petitioners, therefore, the Jones Act did not impose the same restrictions on mineral lands as did the Enabling Act; on the contrary, it explicitly repudiated any such restrictions on the newly granted lands.

We do not agree with this reading of the Jones Act.  First, the suggested interpretation of the "same effect" language would render that language redundant: The statute continues immediately with an additional clause that directly addresses the "vest[ing]" of "titles to such numbered mineral sections." § 1(a), 44 Stat. 1026.  Instead, we believe that the "same effect" language has independent meaning, and that it achieved Congress' stated objective of "extend[ing]" the 1910 grants to encompass all mineral lands and of "[c]onfirming" title to such lands in the States.  44 Stat. 1026.

Second, the language of § 1(b) does not undermine the conclusion that § 1(a) of the Jones Act extended the coverage of the Enabling Act's express restrictions as well as of its grant of lands.  Section 1(b) says that though the mineral *lands* may be sold, the rights to mine and remove the minerals themselves are reserved to the State and may only be leased. Such leases may be undertaken "as the State legislature may

direct." Petitioners would read § 1(b) as containing the sole dispositional restrictions on the newly granted lands, and would read the latter passage as a blanket authority for the States to lease minerals on whatever terms they wish to set, as long as the proceeds of those leases go to the schools.

This interpretation suffers from several defects. To begin with, it does not offer a comprehensive understanding of the statutory regime. Section 1(b) contains no dispositional restrictions on the sale or lease of the newly granted *lands* except for the provision that the mineral rights on those lands are reserved to the State. If the "same effect" language in § 1(a) does not extend the dispositional restrictions in the Enabling Act to the lands granted in the Jones Act, then those lands are subject to no dispositional restrictions at all, though their mineral rights would be reserved. This is inconsistent with the view that the lands granted under the Jones Act are part of the school trust. Similarly, if the "as the State legislature may direct" language is the blanket authority for which petitioners contend, it would allow minerals to be leased for little or no royalty, and thus would leave room for all the abuses that the establishment of a school trust was designed to prevent.

Perhaps the most fundamental defect of the interpretation urged by petitioners is that it would largely perpetuate the dual regime that Congress sought to eliminate by enacting the Jones Act. Under that interpretation, the restrictions in the Enabling Act would continue to apply to unknown mineral lands, but would not apply to known mineral lands. As a result, for example, some of the leases involved in this case might be proper, under the Jones Act, while others would be improper, under the Enabling Act, and the critical difference would rest on a determination, to be made at some future point, whether those lands were known to be mineral in 1910. This is surely not the resolution Congress intended when it

passed this statute, and it is neither a sensible nor an appealing one.[4]

In addition, the "as the State legislature may direct" language is not inconsistent with the express restrictions set forth in the Enabling Act. Given the preceding restrictions on the *sale* of minerals in § 1(b), Congress may have thought it necessary to emphasize that *leases* were subject to no such novel limitations; instead, the States retained all the authority given under the conditional grants made in the Enabling Act. We thus agree with the court below that this language is properly viewed as authorizing the States to regulate the methods by which mineral leases are made and to specify any additional terms in those leases that are thought necessary or desirable, as long as the leases comply with the dispositional requirements set forth in the Enabling Act. See 155 Ariz., at 491, 747 P. 2d, at 1190. But this language, in and of itself, does not dispense with those restrictions.[5]

Both sides place a great deal of emphasis on the later amendments to the Enabling Act, which occurred in 1936 and

---

[4] Under the reading of the Jones Act we adopt, there may still be traces of the dual regime, though they are minimized. For example, it might be argued that "the right to prospect for, mine, and remove" minerals on unknown mineral lands can be sold, whereas those same rights on known mineral lands cannot, since the Jones Act's prohibition in this regard is limited to those lands in "the additional grant made by this Act." § 1(b), 44 Stat. 1026. We need not decide in this case, however, whether that reading of the statute is fair or necessary.

[5] In the wake of the enactment of the Jones Act in 1927, the experience of New Mexico is instructive as a contemporaneous reading of the statute. Concerned that the Act had undermined whatever basis there might have been for the decision in *Neel* v. *Barker*, 27 N. M. 605, 204 P. 205 (1922), the New Mexico government immediately petitioned Congress to authorize a state plebiscite to codify its holding as law. In response, Congress passed a joint resolution to that effect. Joint Resolution No. 7, ch. 28, 45 Stat. 58. The language of the resolution explicitly permitted New Mexico to waive the advertising, appraisal, and bidding requirements on all mineral leases. This explicit language was conspicuously absent from the Jones Act itself.

1951. We think that the language of the original grants of these lands to Arizona is the decisive basis for decision here, and that subsequent amendments are at best only illustrative of how a later Congress read the original terms of the statute. Congress could not, for instance, grant lands to a State on certain specific conditions and then later, after the conditions had been met and the lands vested, succeed in upsetting settled expectations through a belated effort to render those conditions more onerous. Congress could relax the conditions upon which lands had been granted previously, of course, but we see nothing in the later amendments here to suggest that it has done so. Instead, the later amendments are wholly consistent with the view that Congress granted these lands in 1910 and 1927 subject to the conditions discussed previously and has never removed those conditions.[6]

In both the 1936 and the 1951 amendments, Congress reiterated the formulation that the lands could be leased for certain purposes as the state legislature "may direct," Act of June 5, 1936, ch. 517, 49 Stat. 1477, and as it "may prescribe," Act of June 2, 1951, 65 Stat. 52. But the former amendment did not alter the application of § 28 to "[a]ll lands . . . and other products of land," which remained in a passage which directly followed the "as the State legislature may direct" language. And the latter amendment altered the application of § 28 in a manner that tends to confirm the interpretation adopted here: It *expressly* extinguished the advertising, bidding, and appraisal restrictions upon any leases

---

[6] The decision in *Lassen* v. *Arizona Highway Dept.*, 385 U. S. 458 (1967), has no bearing on the issues raised in this case. In *Lassen*, the Court held that Arizona was not obliged to follow the Enabling Act's specific requirements when it condemned land for use in its highway program, seeing "no need to read the Act to impose these restrictions on transfers in which the abuses they were intended to prevent are not likely to occur, and in which the trust may in another and more effective fashion be assured full compensation." *Id.*, at 464. Unlike public condemnation proceedings, however, the private sales and leases at issue here are precisely the kinds of transactions addressed by the federal statutes. *Ibid.*

of these lands "for the exploration, development, and production of oil, gas, and other hydrocarbon substances," 65 Stat. 52, though not upon leases for other purposes, such as mineral leases. Thus the subsequent history of these statutes, to the extent it indicates anything of significance, merely confirms that the original restrictions upon the sale or lease of mineral lands contained in the Enabling Act and the Jones Act remain undiminished in force.

## IV

"The Court's concern for the integrity of the conditions imposed by the [Enabling Act] has long been evident." *Alamo Land & Cattle Co.* v. *Arizona,* 424 U. S. 295, 302 (1976). We conclude that the sale or lease of mineral lands granted to the State of Arizona under these federal statutes must substantially conform to the mandatory requirements set out in the Enabling Act. The court below was correct in declaring Ariz. Rev. Stat. Ann. § 27–234(B) (Supp. 1988) invalid as to nonhydrocarbon mineral leases. The judgment of the Arizona Supreme Court is

*Affirmed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in part and concurring in the judgment.

I join all but Part II–B–1 of the Court's opinion. I disagree both with the view expressed in JUSTICE KENNEDY's opinion that the plaintiffs below, particularly the Arizona Education Association, had no standing, and also with the decision to reach that issue. The Court holds in Part II–B–2 that the question whether the state-court plaintiffs had Article III standing is irrelevant when it is the defendants below who now invoke the authority of the federal courts. The dis-

cussion of the standing question in Part II–B–1 is therefore unnecessary.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I join Part I of the Court's opinion, and I also agree with JUSTICE KENNEDY's conclusion in Part II–B–1 that respondents, plaintiffs below, have failed to show the sort of "injury in fact" necessary to satisfy Article III standing requirements. *Ante,* at 612–617. This requirement "tends to assure that the legal questions presented . . . will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.,* 454 U. S. 464, 472 (1982). For me, absence of standing disposes of this case and requires dismissal of the appeal. *Doremus* v. *Board of Education of Hawthorne,* 342 U. S. 429 (1952).

In *Doremus,* we dismissed an appeal from state court by taxpayers because they lacked standing. The Court now says that although the *Doremus* case is good law for plaintiffs who lack standing but lost in the state court on the merits of their federal claim, it is not good law for such plaintiffs who prevailed on the merits of their federal question in the state courts. The fact that such a rule has a very one-sided application does not necessarily mean it is wrong, but it should at least require a very persuasive justification—a more persuasive one than the Court provides in its opinion.

The Court justifies the result it reaches by saying that the state-court judgment adverse to petitioners is itself a form of "injury" which supplies Article III standing. The difficulty with this explanation is that petitioners—mineral lessees and defendants in the courts below—have always been able to show that a judgment adverse to their position would "injure" them in a very real sense. The defect in the state-

court proceedings, so far as Article III standing is concerned, was not that the proceedings did not threaten to injure petitioners, but that the operation and enforcement of the challenged statute did not injure plaintiffs-respondents. The subsequent proceedings in the state court have obviously not cured this defect.

One could, of course, analogize the proceedings on certiorari in this Court to the commencement of what might be called the federal phase of the lawsuit, and say that for such purpose petitioners are like the plaintiff filing a suit in the federal district court: therefore it is petitioners' standing, not that of respondents, which should concern us at this stage of the litigation. Certainly some of our mootness cases following *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950), indicate that where a judgment entered in a lower federal court no longer has a present effect on the parties, we will not only not review the case but we will direct the vacation of the judgment of the lower courts. But while a present effect of the judgment on the parties may be a necessary condition for continuing federal jurisdiction, I do not believe that it is inevitably a sufficient condition.

The Court's opinion makes much of the fact that "'the record shows the existence of a genuine case or controversy,'" *ante*, at 619, and that "[t]hese parties remain adverse. . . ." *Ibid.* But most of our case law limiting federal standing does not depend on any conclusion that the parties were not "adverse" or that there was no "genuine case or controversy" in the lay sense of those terms. See *Warth* v. *Seldin*, 422 U. S. 490 (1975); *Valley Forge Christian College* v. *Americans United for Separation of Church & State, supra; DeFunis* v. *Odegaard*, 416 U. S. 312 (1974); *Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973). In each of these cases the parties were emphatically adverse to one another and vigorously contended with one another as to how the lawsuit should be decided. No one suggested that the cases

were trumped up, or that they were "friendly suits." The shortcoming in each of them was the failure of the plaintiffs to establish actual injury to themselves as a result of the governmental action which they sought to challenge on federal grounds. To have considered their cases on the merits would have required us to decide the questions presented "in the rarified atmosphere of a debating society"; the plaintiffs had simply a generalized grievance about governmental action which they claimed was prohibited by federal statute or by the United States Constitution. And that is really all that the Court has before it in the present case.

The Court is concerned with the fact that if it applies *Doremus* as sauce for the goose as well as for the gander state courts will remain free to decide important questions of federal statutory and constitutional law without the possibility of review in this Court. This is true, but I think it a rather unremarkable proposition. Some state courts render advisory decisions on federal law of no binding force even within the State. See, *e. g.*, Mass. Const., Art. LXXXV (amending the Massachusetts Constitution to provide: "Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions"); Mich. Const., Art. 3, §8 ("Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date"). In each instance, the interpretation of federal law may affect the governance of the State and thereby make some people better off and some worse off. Yet none of these decisions of federal law are reviewable in this or any other federal court. I see no reason to fear that our dismissal of the present appeal would lead to a legal landscape in which we would no longer have the opportunity to

review many important decisions on questions of federal law. Therefore I see no reason why this Court should bend its Article III jurisprudence out of shape to avoid a largely imaginary problem.